[No. 10468.  *En Banc.*  December 13, 1913.]

FISHER FLOURING MILLS COMPANY, *Appellant*, v.
C. A. SWANSON, *Respondent.*[1]

CONTRACTS — VALIDITY — "RESTRAINT OF TRADE" — "RESTRAINT OF COMPETITION." There is a distinction between the terms contracts "in restraint of trade" and contracts "in restraint of competition," in that the former applies to undertakings not to pursue a particular calling or business, which are valid only when reasonably restricted as to time and place, while the latter includes all contracts tending to unreasonably restrict competition by other means which are void as against public policy irrespective of limitations as to time or place.

CONTRACTS—VALIDITY—"RESTRAINT OF COMPETITION"—MONOPOLIES —TESTS—REASONABLE CONTRACTS. The basis of the rule of public policy against restraints in competition being the tendency to create a monopoly, whether a restriction covers such a part of the supply, or is so complete a restriction as to be against public policy, must be determined by the facts of each particular case; and a manufacturer's contract fixing retailers' prices as incidental to some main contract will be sustained where it involves less than a controlling part of a given commodity in a given market, not proceeding from nor tending to create a monopoly, and where it was reasonable in reference to the interests of the parties and of the public, and the price fixed was fairly necessary to the protection of the covenantee, and fair to the public in that it furnished only a reasonable profit to the parties.

CONTRACTS—LEGALITY—RESTRAINT OF COMPETITION—MONOPOLIES— MAXIMUM SELLING PRICE. A contract between a manufacturer and retailers requiring them to maintain fixed minimum retail selling prices for a certain brand of flour constituting an insignificant part of the entire supply in any community, sold by all retailers in all markets in competition with many other brands, at only a fair profit, and which was necessary to the manufacturer in retaining the good will of retailers and building up a reputation for the brand, is not void as against public policy; since it does not tend to control the market or create a monopoly or restrict competition.

SAME—RESTRICTIONS ON COMPETITION—VALIDITY. A manufacturer's selling contract requiring retail dealers of a certain brand of flour to maintain minimum retail selling prices, is not necessarily restrictive of competition or detrimental to the public, where by the maintenance of such price it enables the manufacturer to main-

[1]Reported in 137 Pac. 144.

tain an unusual standard of excellence, as it thereby stimulates competition in the excellence of the product, to the advantage of the public; especially since competition by cut rate retailers for advertising purposes whose losses are recouped on other articles is not necessarily advantageous to the public.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered January 20, 1912, dismissing an action for an injunction, upon sustaining a demurrer to the complaint. Reversed.

*Hastings & Stedman* and *Higgins, Hall & Halverstadt* (*Hyman Zettler*, of counsel), for appellant.

*John E. Humphries, Charles E. Remsberg*, and *William A. Johnson*, for respondent.

ELLIS, J.—In this action, the plaintiff seeks to enjoin the defendant from selling flour manufactured by the plaintiff at less than the retail price fixed by the plaintiff in a contract of sale made with the defendant, and to recover damages in the sum of $1,000. The complaint alleges, in substance, that the plaintiff is a Washington corporation, with its principal place of business at Seattle, where it has erected a large manufacturing plant and installed special machinery for manufacturing a special brand of flour known as "Fisher's Blend of Patent Flour;" that the cost of manufacturing this flour is greater than that of ordinary flour; that the plaintiff has widely, and at great expense, advertised this flour as a blended flour, pure, wholesome and of unusual excellence, and has used certain copyrighted designs and the above trade-name to acquaint the public with the flour, so that it has become widely known as of unusual excellence and as of higher price than ordinary patent flour, and that large quantities of it are sold in Seattle and King county; that it is necessary to operate the mill to its full capacity in order to continue the business at a profit; that the flour is sold in all of its markets in constant and keen competition with many other brands of patent flour of all qualities, and that the quantity of plaintiff's flour

so sold is only a very small part of the pure blended flour and
of the quantity of ordinary patent flour sold in each of such
markets; that it is necessary to sell the flour through all re-
tail dealers in each community rather than through one or
two, as may be profitably done with ordinary patent flours,
so that the good will of the retail dealers is necessary to the
success of the company; that in order to keep this good will,
it is necessary to maintain a minimum retail price offering a
reasonable profit to the retailer; that if the uniform minimum
price is not maintained, the reputation of the flour will be
injured, the good will of the dealers lost and the plaintiff will
be prevented from operating its mill at a profit; that the de-
fendant conducts a retail grocery store in Seattle, and on or
about October 3, 1911, entered into an oral contract with the
plaintiff, agreeing to purchase from the plaintiff a car load of
this flour at the uniform wholesale price, and further agreeing
not to sell the flour at less than a certain minimum retail
price; that these prices were the same as the wholesale and re-
tail prices maintained by the plaintiff and its other customers,
and permit no more than a reasonable profit; that, according
to the contract, the plaintiff delivered an installment of the
flour on this purchase, the defendant accepting therewith a
written invoice containing the following stipulation:

"Retail prices. Our flour is sold on condition, which is
made a part of the consideration of the sale of said goods,
that the purchaser, if he retails the same, will maintain our
fixed minimum retail selling prices, and if he wholesales them,
they are sold subject to the same conditions. Nothing in the
above conditions shall prevent the purchaser from fixing the
selling price in excess of the above lists when cost of trans-
portation or other local conditions necessitates the same;"
that, since the delivery of the flour to the defendant, he has
violated the agreement by selling the flour at less than the
agreed price, and has widely advertised such sales, which
price is less than the general retail price of all the other pa-
tent flours so sold in Seattle and the state of Washington;
that his purpose in so doing is to attract customers to his

store, and that he has threatened to continue this practice; that the defendant's action in this respect is causing damage to the plaintiff by injuring the reputation of the flour with the public and destroying its sale to retailers in Seattle and throughout the state; that by reason of defendant's action, other retailers are threatening to follow his example, which will curtail the sales of flour and cause irreparable damage to the plaintiff; that it has already decreased the sales of the flour, by rendering it unpopular with the retailers, to the plaintiff's damage in the sum of $1,000; that the plaintiff has no adequate remedy at law. The defendant demurred to the complaint on the ground that it does not state a cause of action, and that the court has no jurisdiction of the subject-matter. The demurrer was sustained, and the plaintiff electing to stand upon its complaint, the action was dismissed. The plaintiff appeals.

A single question is presented: Has a manufacturer, who has given a reputation to particular goods which he creates, the right to fix in his contract of sale to retailers a reasonable minimum price at which those goods shall be sold to consumers?

It may be premised as a postulate that a manufacturer who has imparted a reputation to his goods may lawfully employ any means to secure the legitimate benefits of that reputation not inhibited by statutory enactment or inimical to a sound public policy.

It is not claimed, on the one hand, that the contract in question is inhibited by any statute of this state. No question of interstate commerce is involved. We are, therefore, not here concerned with the Sherman anti-trust act. Nor is it claimed, on the other hand, that the fact that the article sold was under a trade-name or in a trade-dress, or the fact that it was manufactured by a patented process, affords the contract any immunity from invalidity which it would not otherwise possess. These things must be regarded as immaterial to this discussion. No question of public service cor-

porations is involved. What we shall say has no application to contracts of corporations charged with public functions or duties as such.

The question is thus reduced to the inquiry whether, at common law, the contract here involved is violative of any canon of public policy. In considering this question, much confusion may be avoided by marking the distinction not always observed in the adjudicated cases between those contracts which, since the earliest history of the law on the subject, have been designated as "contracts in restraint of trade," and those more correctly designated as "contracts in restraint of competition." The term "contracts in restraint of trade" has so long been applied to undertakings not to pursue a particular profession, trade, or business, and has so thoroughly acquired that conventional significance as to render its use in any other connection confusing. The rules relating to such contracts are of long standing and thoroughly established. Such contracts are valid only when restricted as to time and to place, and when reasonably necessary to the protection of the party in whose interest they are made. Conversely stated, such contracts, when without limit as to time or place, are invalid. *Long v. Towl,* 42 Mo. 545, 97 Am. Dec. 355.

The broader doctrine inhibiting, as contrary to public policy, all contracts which, by any other means, tend unreasonably to restrict competition is of much more recent development, and is much less thoroughly settled. This doctrine has to do with the rules of public policy relating to control of markets. See note to *Harding v. American Glucose Co.,* (Ill.) 74 Am. St. 238, 239; Noyes; Intercorporate Relations, § 336; 2 Eddy, Combinations, §§ 719, 722; Cooke, Combinations, Monopolies and Labor Unions (2d ed.), § 160. This broader doctrine is primarily directed against monopoly in any form, and seeks to protect the public interest by holding invalid all contracts by which monopoly of a given market may be either created or sustained, or, as such, made profitable to its beneficiaries, where the right to make them is not inci-

dental to a legal monopoly such as is accorded by the patent laws. With these last, we are not here concerned. It is manifest that, in case of such contracts, the public interest is not conserved by mere limitations either as to time or space. The public interest can only be secured by a prohibition of all contracts having a tendency to create or foster monopoly by a control of any given market. Noyes, Intercorporate Relations (2d ed.), § 357.

Since limitations of time and space do not serve as the test of the validity of contracts in restraint of competition, the test must be sought in the reason which underlies the rule of public policy. It must be found in the tendency of the given contract to control the given market. If the contract has that tendency, it is against public policy. If it does not have that tendency, it is not. In applying this test, the public interest is always the first and controlling consideration. A contract or combination creating a general, that is to say, complete restraint or restriction, however slight, within a given market, is essentially invalid because it must either result from, or tend to produce, a monopoly. Its inevitable tendency is to destroy competition. Under an economic system founded upon competition, every general restriction, that is, every restriction covering all or a controlling fraction of a given commodity, is essentially unreasonable. It is not fairly necessary to the protection of the manufacturer. Having a monopoly, he needs no protection. It is not in any sense beneficial to the public, because it does not tend to create an incentive to increased excellence of product in order to maintain the better price, but, because of the monopoly, has a contrary effect.

And again, when the contract fixing the price is not ancillary to some main lawful contract, the sole object of the contract is to restrain competition and enhance prices, and its only tendency is to control the market. It is therefore invalid because of this tendency, without reference to its reasonableness in other particulars. In such a case, there is no

main lawful purpose to subserve which partial restraint is permissible, hence nothing by which to measure the reasonableness of the restraint. Its only measurable tendency would be to create a monopoly. Such a contract is therefore invalid. *United States v. Addyston Pipe & Steel Co.*, 85 Fed. 271; *State v. Duluth Board of Trade*, 107 Minn. 506, 121 N. W. 395, 23 L. R. A. (N. S.) 1260.

But it does not follow that every contract restraining competition as to an insignificant part of the total of a given commodity, in a given market, in any degree, is obnoxious to public policy. At common law, contracts containing limited restrictions on competition as incidental to some main contract and not entered into for the sole purpose of suppressing competition or controlling the market, are not always and necessarily invalid. 2 Eddy, Combinations, § 723.

"A monopoly created by the crown seems to have been necessarily illegal, and, subject to the limitations hereafter considered, the same seems true of what is strictly a monopoly, that is a complete restriction upon competition, resulting from the acts of individuals. But, however it may have been as to restrictions upon competition created by the crown, it seems clear enough that not all restrictions upon competition resulting from the acts of individuals are illegal. This results from the view that seems to be generally accepted, that the economic effects of a restriction upon competition are not necessarily evil, in other words, that unrestricted competition results in economic evils, capable of prevention or removal by some degree at least of restriction upon such competition. A different view of such economic effects has, however, led to judicial declaration in sweeping condemnation of any restriction upon competition, though, as may readily be inferred, there is no decision to that effect." Cooke, Combinations, Monopolies and Labor Unions, § 118.

See, also, *State v. Duluth Board of Trade, supra;* Noyes, Intercorporate Relations (2d ed.), § 336; 1 Eddy, Combinations, §§ 307-324, inclusive; *Herriman v. Menzies*, 115 Cal. 16, 46 Pac. 730, 56 Am. St. 82, 35 L. R. A. 318; *Oakdale Mfg. Co. v. Garst*, 18 R. I. 484, 28 Atl. 973, 49 Am. St. 784,

23 L. R. A. 639; *State v. Eastern Coal Co.*, 29 R. I. 254, 70 Atl. 1, 132 Am. St. 817; *Lanyon v. Garden City Sand Co.*, 223 Ill. 616, 79 N. E. 313, 9 L. R. A. (N. S.) 446.

Partial restrictions have been held valid where the restraint was in different particulars. For example: The contract may limit the vendee's right of sale to a certain territory—a restriction as to place. *Phillips v. Iola Portland Cement Co.*, 125 Fed. 593. It may provide that the vendee deal exclusively with the vendor and only in articles of the vendor's manufacture—a restriction as to person. *Brown v. Rounsavell*, 78 Ill. 589; *Wood Mowing & Reaping Co. v. Greenwood Hardware Co.*, 75 S. C. 378, 55 S. E. 973, 9 L. R. A. (N. S.) 501; *Ferris v. American Brewing Co.*, 155 Ind. 539, 58 N. E. 701, 52 L. R. A. 305; *Butterick Publishing Co. v. Fisher*, 203 Mass. 122, 89 N. E. 189, 133 Am. St. 283. Again, the restriction may be as to the price which the retailer must charge for goods purchased from the manufacturer—the case here involved. *Elliman & Sons v. Carrington & Son*, L. R. 1901, 2 Ch. Div. 275; *Walsh v. Dwight*, 40 App. Div. 513, 58 N. Y. Supp. 91; *Grogan v. Chaffee*, 156 Cal. 611, 105 Pac. 745, 27 L. R. A. (N. S.) 395; *Commonwealth v. Grinstead*, 111 Ky. 203, 63 S. W. 427, 56 L. R. A. 709.

The foregoing authorities make it clear that the courts now generally recognize, as the basis of the rule of public policy against restraints on competition, the tendency to create a monopoly. It is manifest that a restriction of competition between the owners of an insignificant part of the entire supply of a given commodity in a given community could not create a monopoly nor injuriously affect the public. It is equally clear that the restriction need not be a complete restriction covering the entire supply of a given commodity in order to injuriously affect the public, but, unless it be held that every restriction is *per se* illegal, where are we to draw the line? Obviously, the answer must be found in the facts of each particular case. If, considering all of the circumstances, including the character of the business, the necessities of the parties,

the existence of other contracts, if any, of the same character, the restriction results or tends to result in a substantial control of the supply or price of a given commodity within a given area by a single dealer or a few dealers, or by what amounts to a combination of all of the dealers, the contract is invalid. Substantial control of a market by one or a few is, of course, as injurious to the public as an absolute control. Wherever, therefore, there exists a monopoly or combination, or the contract creates or tends to create a monopoly or such approximation to monopoly as to practically bar others from entering the field by the chance of failure, a contract fixing retail prices is void as essentially injurious to the public.

"It is not essential, however, to the control of the market, within the rule, that it should be complete. Practical control is sufficient; and this does not imply an absolute elimination of competition.

"On the other hand, a mere restriction of competition does not give control of the market and is not unlawful. The commercial maxim, 'competition is the life of trade,' while not adopted as a maxim of jurisprudence, finds a place in many decisions, and the language of the courts is often broad enough to include, as opposed to public policy, every combination in restraint of competition, regardless of degree. But the weight of authority—as well as sound principle—supports the view that every combination restricting competition is not invalid—that restriction, to be unlawful, while not necessarily amounting to total suppression, must give, substantially the control of the market.

"Just where the line is to be drawn between a lawful and unlawful restriction of competition—just what restriction is practical suppression—must depend largely upon the facts and circumstances of each case. As said in *Hoffman v. Brooks*, a case not officially reported: 'Those engaged in any trade or business may, to such limited extent as may be fairly necessary to protect their interests, enter into agreements which will result in diminishing competition and increasing prices. Just the extent to which this may be done the courts have been careful not to define, just as they have refused to set monuments along the line between fairness and fraud.' " Noyes, Intercorporate Relations, § 356.

See, also, Cooke, Combinations, Monopolies and Labor Unions § 120. As exemplifying that the facts in each case must determine the effect of the contract, and that practical control of the market or any approximation to monopoly marks the line between valid and invalid restrictions, see the following decisions: *Herriman v. Menzies, Walsh v. Dwight, Oakdale Mfg. Co. v. Garst, Phillips v. Iola Portland Cement Co.,* and *State v. Duluth Board of Trade, supra; Marsh v. Russell,* 66 N. Y. 288; *Export Lumber Co. v. South Brooklyn Sawmill Co.,* 54 App. Div. 518, 67 N. Y. Supp. 626; *United States v. Nelson,* 52 Fed. 646; *Meredith v. New Jersey Zinc & Iron Co.,* 55 N. J. Eq. 211, 37 Atl. 539.

The fact that the circumstances of each particular case and the situation of the parties, in addition to the effect on the public welfare must be considered, and that of all circumstances, the dominant consideration is the welfare of the public, makes it difficult to state by definition, except in the broadest way, any rule for determining the validity of any such contract as that here involved. Perhaps the following is as near a complete definition as we can formulate from the adjudicated cases: Contracts fixing prices as incidental to some main contract, and involving less than a controlling part of a given commodity in a given market, not proceeding from, nor tending to create, or to maintain a monopoly, will be sustained when the restriction is, under the circumstances of the particular case, reasonable in reference to the interests of the parties, and reasonable in reference to the interests of the public; that is to say, when the price fixed is fairly necessary to the protection of the covenantee, and fair to the public in that it furnishes only a reasonable profit to the contracting parties. Lacking these elements, such contracts are invalid as contrary to public policy. As said by Lord Macnaghten in *Nordenfelt v. Maxim Nordenfelt Guns and Ammunition Co.,* 1894 App. Cas. 535, 565:

"The true view at the present time I think, is this: The public have an interest in every person's carrying on his

trade freely; so has the individual. All interference with individual liberty of action in trading, and all restraints of trade of themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule. But there are exceptions: restraint of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case. It is a sufficient justification, and indeed it is the only justification, if the restriction is reasonable—reasonable, that is, in reference to the interests of the parties concerned and reasonable in reference to the interests of the public, so framed and so guarded as to afford adequate protection to the party in whose favor it is imposed, while at the same time it is in no way injurious to the public."

And again, as said by Mr. Justice Hughes, in *Dr. Miles Medical Co. v. Park & Sons*, 220 U. S. 373, 406:

"To sustain the restraint, it must be found to be reasonable both with respect to the public and to the parties and that it is limited to what is fairly necessary, in the circumstances of the particular case, for the protection of the convenantee. Otherwise restraints of trade are void as against public policy."

Measured by our definition, which, as it seems to us, is as stringent as any fair construction of the authorities will sustain, the facts and circumstances as alleged in the complaint disclose no sinister purpose in the contract pleaded, nor any tendency inimical to the public interest. It may be objected that, since protection against general restriction is the basis of the rule of public policy, then, if a general restriction is brought about by all, or nearly all, of the dealers in a given commodity in a given area making contracts of the same character with all retailers, the public interest is injuriously affected, just as if there were an actual combination or contract creating or approximating a monopoly. The possibility of such a result as a mere coincidence, however, is too remote to furnish a reason for declaring the contracts of a single manufacturer, who has no monopoly or approximation thereto, void. If a controlling number of manufacturers or whole-

sale dealers in a given commodity should make identical con-
tracts with the retailers of that locality, it would doubtless
be the result of an agreement, secret or otherwise, between
them, and all such contracts would be invalid as in aid of a
combination in restraint of competition. The coincidence
would be almost conclusive evidence of the illegal combination,
and sufficient basis for declaring all of the contracts void.
No such condition, however, is presented by the record before
us.

Such a contract as that here in question is of interest to
the public only where the whole of a given commodity, or a
measurable approximation to the whole of that commodity, is
in the control of one of the contracting parties, or of some
combination of which he is a member or which dictates his
policy. It is monopoly, either actual or approximate, hence
potential, against which the public interest is arrayed, not a
fair reward to individual effort and initiative, which is as
essential to competition as a competitive price. In the ab-
sence of a monopoly, either actual or potential, as above
defined, a contract fixing retail prices to the consumer can-
not have an effect appreciably inimical to the public interest,
because it cannot fix prices at an unreasonably high figure
without defeating its own purpose by either signally failing to
maintain the fixed price, or putting the individual manu-
facturer out of business. In either case, it fails to restrict
competition. Either the consumers will not buy the product
at the price fixed, or, if they do, the high price will stimulate
competition in production and the price will inevitably fall.
The given manufacturer will thus be compelled to accept one
or the other alternative. He must either fix the price to cover
only a reasonable profit, or he must retire from business, and
this, for the simple reason that, in the absence of a monop-
oly, either actual or potential, of the entire supply, the nat-
ural conditions of trade will defeat any attempted restric-
tion of competition. Under our present competitive system,
the public is as vitally interested in the maintenance of com-

petition in the excellence of the product as it is in competition in prices. The one is as essential to value received at any price as the other is to a reasonable price for any value. Lacking either, the public will eventually be the loser, either in quality of product or in enhancement of price, which comes to the same thing. No sound public policy will insist upon the complete sacrifice of competition in one of these elements to competition in the other. A monopoly, however, either complete or approximate, tends to the destruction of both, hence is, on all scores, against public policy. But where a given product is not in the hands of one man or a combination of men, there is no monopoly, either actual or proximate, and the public has no interest hostile to a contract by a single manufacturer among many, intended and reasonably calculated to enable him to maintain an unusual standard of excellence in that part of the aggregate of the given product which he puts out. On the contrary, the public interest, so far as it is touched by the contract, is in sympathy with it, because served by it.

Applying the principles which we have developed from the cases, it seems clear that this contract is valid. The facts alleged negative the idea of any existing monopoly in the appellant, and the contract has no tendency to create one. The retail selling price was fixed merely as ancillary to the contract of sale to the respondent. The fixing of the price was reasonably necessary to protect the appellant, and reasonable as applied to the public, in that it provides only for a fair profit. Fairly considered, the contract, while slightly restricting competition, is primarily intended to promote competition by enabling the appellant to compete with other high grade flours while maintaining the excellence of its product. As said by the supreme court of California in a case closely parallel to that before us, *Grogan v. Chaffee, supra:*

"Under these circumstances we see no reason why the contract alleged by the plaintiff should not, as between the parties to it, be held to be valid. It violates no canon of

public policy. By its terms the buyer is not precluded from engaging in any lawful trade. He may sell other olive oil at any price and on any conditions satisfactory to him. The producer was, in the first instance, under no obligation to sell his oil, and when he did sell it had the right to exact, as part of the consideration for the sale, a promise by the purchaser that he would not sell it at less than a stipulated price. There is nothing either unreasonable or unlawful in the effort by a manufacturer to maintain a standard price for his goods. It is simply a means of securing the legitimate benefits of the reputation which his product may have attained. Contracts similar to the one under discussion have been considered in a number of cases, and have generally been upheld where, as here, they had no tendency to create a monopoly."

After citing and reviewing many authorities, the opinion continues:

"The necessary result of what we have said is that the complaint must be held sufficient. It is alleged that the defendant bought oil under an express agreement that he would not sell it at less than given prices, and that he had sold and threatened to sell it at less than such prices. This is a violation of plaintiff's rights under his contract. Whether this contract could be enforced against persons who might come into possession of plaintiff's oil, with notice of the restriction imposed by him on its sale, but without having made any direct agreement to respect such restriction, is a question not here presented. (See *Garst v. Hall & Lyon Co.*, 179 Mass. 589, 61 N. E. 219)."

In *Walsh v. Dwight, supra,* the New York supreme court, touching a contract closely analogous to that here involved, said:

"It is difficult to see upon what ground it can be claimed that such a contract is illegal. That the defendant would have the right to establish agencies for the sale of their goods, or to employ others to sell them, at such prices as the defendants should designate, cannot be disputed. Nor can it be that a manufacturer of merchandise cannot agree to sell to others upon condition that the vendees, in selling at retail, should charge a specified price for the goods sold, or should sell only the manufactured product of the manufacturer. If

a dealer in articles of this kind, for his own advantage, agrees to confine his business to a particular line of goods, or agrees with the manufacturer to charge a particular price for the articles which he sells in his business, such an agreement is not illegal, as in restraint of trade or as tending to create a monopoly, as there is nothing in the agreement to prevent others from engaging in the business, or the manufacturers of other articles from selling their products to any one who is willing to buy."

In *Commonwealth v. Grinstead, supra,* notwithstanding the existence of a statute expressly prohibiting any person, firm or corporation doing business in Kentucky from entering into any pool, trust, combine, agreement, confederation or understanding with any other person, firm or corporation for the purpose of regulating, controlling or fixing prices, the court upheld the plan of fixing minimum retail prices of certain brands of goods of established reputation by contracts between the manufacturer and retailer, on the ground that there was no concerted action among the manufacturers, since the price was fixed by each manufacturer on his own product only.

The English courts maintain the same doctrine. *Elliman & Sons v. Carrington & Son, supra; National Phonograph Co. v. Edison-Bell Consol. Phonograph Co.,* 1908, 1 Ch. Div. 335.

That the tendency to monopoly, complete or substantial, is the real test in all cases involving the restraint of competition is demonstrated by cases involving labor unions. Independent of statute, the test of legality as to contracts or combinations in restraint of competition is the same for sellers of merchandise as for sellers of labor. This, so far as we are advised, has never been judicially challenged.

"On principle, it is not apparent why the legality of combinations among employees as such, should be subjected to any different test from that applied to combinations among employers as such, or among tradesmen as such." Cooke, Combinations, Monopolies and Labor Unions, § 52.

See, also, 27 Cyc. 904; *Herriman v. Menzies, supra; Milwaukee Masons' & Builders' Ass'n v. Niezerowski*, 95 Wis. 129, 70 N. W. 166, 60 Am. St. 97, 37 L. R. A. 127; *Gatzow v. Buening*, 106 Wis. 1, 81 N. W. 1003, 80 Am. St. 17, 49 L. R. A. 475; *Froelich v. Musicians Mutual Benefit Ass'n*, 93 Mo. App. 383; *O'Brien v. Musical etc. Union*, 64 N. J. Eq. 525, 54 Atl. 150; *Folsom v. Lewis*, 208 Mass. 336, 94 N. E. 316, 35 L. R. A. (N. S.) 787; *More v. Bennett*, 140 Ill. 69, 29 N. E. 888, 33 Am. St. 216, 15 L. R. A. 361.

It would seem that the doctrine which would hold the contract here involved a contract or combination in illegal restraint of competition, carried to its logical extent, would render illegal practically every trades union or labor union in the country. The courts should be slow to adopt a rule of such far reaching results. Such unions or associations for the purpose of maintaining wages are now universally recognized as legal. 24 Cyc. 819 C.

The respondent relies solely upon the following decisions: *Park & Sons Co. v. Hartman*, 153 Fed. 24; *Bobbs-Merrill Co. v. Straus*, 210 U. S. 339, and *Dr. Miles Medical Co. v. Park & Sons Co.*, 220 U. S. 373, affirming the decision of the circuit court of appeals in 164 Fed. 803. The decision in *Park & Sons Co. v. Hartman* is not necessarily in antagonism to the views here expressed. That case involved a monopoly. It holds that there is no such analogy between the statutory monopoly accorded by the patent laws and the monopoly resulting from the sole possession of a trade secret as to make it lawful to protect the latter by contracts or notices fixing the retail price, as is permitted in the case of patented articles. The opinion is devoted largely to a demonstration of the proposition, which we deem unquestionably sound, that the owner of a secret formula for the manufacture of a proprietary medicine, though he may protect the secret by contract against its disclosure, cannot protect the profits resulting from his monopoly in the manufactured article (in that case, Peruna), by contracts or notices fixing

a minimum price at which the jobbers and retailers shall sell it. That the effect of the contracts there involved was an absolute prevention of any competition in prices, a complete or general restriction as to Peruna, because of their application to the whole supply of that article on the market, is shown by the opinion, where it is said:

"Thus all room for competition between retailers, who supply the public, is made impossible. If these contracts leave any room at any point of the line for the usual play of competition between the dealers in the product marketed by complainant, it is not discoverable. Thus a combination between the manufacturer, the wholesalers, and the retailers to maintain prices and stifle competition has been brought about. It is true that the complainant is not in a combination with other makers of 'Peruna.' There are no others. If there were, there would not be a complete or general restraint; for it might then happen that these others, not being bound by any covenants, could supply the public. If the supply to come from them was adequate for the public demand, the public might be in no wise affected."

That the learned judge who wrote the opinion recognized the validity of such contracts as between the actual contracting parties, where no monopoly is involved, and when merely ancillary to some main contract, and reasonably necessary to the protection of the retained business of the covenantee, is also evident from the following language which further distinguishes that case from the one before us:

"Looking to the averments of the bill as a whole and to the scheme of business as disclosed by the contracts themselves, we cannot escape the conclusion that the covenants restricting sales and resales have as their prime object the suppression of competition between those who buy to sell again. Any benefit to the retained business to result from them is manifestly but an incident of the main purpose, which is to benefit his vendees and subvendees by breaking down their competition with each other. Restraints which might be upheld if ancillary to some principal contract cannot be enforced if, when unmasked, they appear to be the main purpose of the contract and not subordinate. The covenants in

the contracts signed by the retailers are not even collateral
to any sales by the complainant, but to sales made by the
wholesalers. Although they run to the complaint, their
prime purpose is neither the protection of the retained busi-
ness of the complainant, nor of the wholesaler, but only to
prevent competition between retailers. Covenants protect-
ing the seller of property against the competition of the
buyer, by its use against the business retained by the seller,
which are upheld if not wider than necessary for that purpose,
have been covenants where the main purpose has been to pro-
tect the seller himself against competition directed against
his retained business."

The opinion, when fully considered, fairly recognizes every
principle hereinbefore developed from the authorities as sus-
taining the contract here involved.

In *Bobbs-Merrill Co. v. Straus,* it was held that the sole
right to vend a copyrighted book secured by the United
States statute to the owner of the copyright does not include
the right to impose by a mere notice printed on the same page
with the notice of copyright, a limitation as to the price at
which the book shall be sold at retail by future purchasers
with whom there is no privity of contract. The distinction
from the case in hand is too plain to require further comment.

Nor do we deem the decision of the United States supreme
court in *Dr. Miles Medical Co. v. Park & Sons Co.* control-
ling on the facts here presented. In that case, the bill al-
leged the manufacture of certain proprietary medicines under
secret formulae and processes, and the sale thereof under
trade-marks and trade-dress; that to prevent injury to its
business by the sale of its medicines at cut prices, complain-
ant had adopted a dual system of contracts controlling the
sale and resale of its product; that the system contemplated
consignments to wholesale dealers, permitting them to sell
only to other contracting wholesale dealers and retail deal-
ers who had also contracted with the complainant to sell its
goods at fixed prices; that the defendant, refusing to enter
into a consignment contract, had induced complainant's

wholesale and retail agents, by means of fraudulent representations, to violate their contracts and sell goods of complainant's manufacture to the defendant, with the intention of selling such goods at cut rates to attract customers for other merchandise.     An injunction against this practice was sought.     It appeared that consignment contracts had been made with over four hundred jobbers and wholesalers, and retail agency contracts with twenty-five thousand retail dealers in the United States.     The court refused relief on the ground that, by its system of interlocking restrictions, complainant sought to control not only the prices at which its agents might sell its product, but the prices for all sales by all dealers at wholesale or retail, whether purchasers or subpurchasers, and thus fix the amount which the consumer shall pay, eliminating all competition.     The court held that such a system amounts to a restraint of trade, and is invalid both at common law and under the Sherman Anti-Trust Act.     It will be noted that the system there involved had no purpose save to create and perpetuate a monopoly which, under any view of the authorities, is invalid.     While certain expressions in the opinion might appear contrary to the views we have expressed, the opinion expressly states that the mere fact that some restraint results does not necessarily render the contract invalid, and clearly recognizes the principles upon which the contract here involved must be held valid.     Mr. Justice Hughes, speaking for the court, uses the following language:

"With respect to contracts in restraint of trade, the earlier doctrine of the common law has been substantially modified in the adaptation to modern conditions.     But the public interest is still the first consideration.     To sustain the restraint, it must be found to be reasonable both with respect to the public and to the parties and that it is limited to what is fairly necessary, in the circumstances of the particular case, for the protection of the covenantee.     Otherwise restraints of trade are void as against public policy.     As was said by this court in *Gibbs v. Baltimore Gas Co.*, 130 U. S.

p. 409, 'The decision in *Mitchel v. Reynolds*, 1 P. Wms. 181; S. C. Smith's Leading Cases, 407, 7th Eng. Ed.; 8th Am. Ed. 756, is the foundation of the rule in relation to the invalidity of contracts in restraint of trade; but as it was made under a condition of things, and a state of society, different from those which now prevail, the rule laid down is not regarded as inflexible, and has been considerably modified. Public welfare is first considered, and if it be not involved, and the restraint upon one party is not greater than protection to the other party requires, the contract may be sustained. The question is, whether, under the particular circumstances of the case and the nature of the particular contract involved in it, the contract is, or is not unreasonable. *Rousillon v. Rousillon*, 14 Ch. D. 351; *Leather Cloth Co. v. Lorsont*, L. R. 9. Eq. 345.' "

The cases upon which the respondent relies are all reviewed and distinguished from a case such as that here presented, in *Ghirardelli v. Hunsicker*, 164 Cal. 355, 128 Pac. 1041.

We do not hold that a mere notice printed on the packages or bill of lading, in the absence of express contract to be bound by such notice, would be sufficient to create a valid restriction of the sale price, however unobjectionable. We do not hold that a manufacturer would have the right by any such notice to pursue his product into the hands of third parties and fix their selling price. The right, where it can be exercised at all, rests in contract, and it would seem that the contract should only be held binding upon the parties to it, except where the breaking of the contract is induced by the fraud of the third party. As observed in *Dr. Miles Medical Co. v. Park & Sons Co.*, *supra:*

"Whatever right the manufacturer may have to project his control beyond his own sales must depend, not upon an inherent power incident to production and original ownership, but upon agreement."

See, also, *Garst v. Hall & Lyon Co.*, 179 Mass. 588, 61 N. E. 219, 55 L. R. A. 631, and *Bobbs-Merrill Co. v. Straus, supra.*

Finally, it seems to us an economic fallacy to assume that

the competition which, in the absence of monopoly, benefits the public, is competition between rival retailers. The true competition is between rival articles, a competition in excellence, which can never be maintained if, through the perfidy of the retailer who cuts prices for his own ulterior purposes, the manufacturer is forced to compete in prices with goods of his own production, while the retailer recoups his losses on the cut price by the sale of other articles at, or above their reasonable price. It is a fallacy to assume that the price cutter pockets the loss. The public makes it up on other purchases. The manufacturer alone is injured, except as the public is also injured through the manufacturer's inability, in the face of cut prices, to maintain the excellence of his product. Fixing the price on all brands of high grade flour is a very different thing from fixing the price on one brand of high grade flour. The one means destruction of all competition and of all incentive to increased excellence. The other means heightened competition and intensified incentive to increased excellence. It will not do to say that the manufacturer has no interest to protect by contract in the goods after he has sold them. They are personally identified and morally guaranteed by his mark and his advertisement. *Mazetti v. Armour & Co.*, 75 Wash. 622, 135 Pac. 633. His reputation as a manufacturer, one of his chief assets, is bound up in them.

The attitude of the respondent, who has wilfully violated his contract, presents no equities in his favor. The allegations of the complaint show that the public interest will in no wise suffer from an enforcement of the contract. As between the parties, the appellant is entitled to the relief for which he prays.

The judgment is reversed.

CROW, C. J., GOSE, CHADWICK, MAIN, MOUNT, MORRIS, and PARKER, JJ., concur.