[No. 28330.  *En Banc.*  September 12, 1941.]

CARLTON SEARS *et al., Respondents,* v. WESTERN THRIFT STORES OF OLYMPIA, INC., *et al., Appellants.*[1]

[1]Reported in 116 P. (2d) 756.

*L. B. Donley,* for appellants.

*Caldwell, Lycette & Diamond, John N. Sylvester,* and *John S. Lynch, Jr.,* for respondents.

*The Attorney General, amicus curiae.*

SIMPSON, J.—In this case plaintiffs sought to recover damages and to secure an injunction, because of a violation by defendants of the Washington fair trade act.

The complaint alleged that plaintiffs were retail merchants selling certain named articles of merchandise under contract with various manufacturers, by the terms of which the retail price was agreed upon; that defendants, with full knowledge of the contracts entered into by plaintiffs and the manufacturers, sold

the articles named in the contracts at a price less than the amount fixed by those instruments; and that the defendants knowingly and wilfully offered for sale and advertised other commodities produced by the manufacturers at prices below that fixed by the contracts. Defendants demurred upon all the grounds mentioned in Rem. Rev. Stat., § 259 [P. C. § 8346].

The parties then entered into a stipulation which reads:

" . . . that in the event that the court over-ruled the demurrer of the defendants to the said complaint of the said plaintiffs that the defendants would not plead further and that the court should enter judgment in accordance with the prayer of the complaint and the law in the premises and that judgment for damages should be limited in the nominal sum of One ($1.00) Dollar."

Thereafter, judgment was entered overruling the demurrer, and enjoining the defendants from selling certain specified articles at a price less than that fixed by the contract made between plaintiffs and the manufacturers of those articles. Defendants have appealed. The assignments of error are in overruling the demurrer to the complaint, and in entering judgment in favor of plaintiffs and against defendants.

The purpose of the instant case is to test the constitutionality of the fair trade act, Rem. Rev. Stat. (Sup.), § 5854-11 to § 5854-16 [P. C. § 7109-51 to § 7109-56].

Does the act represent a valid exercise of the legislative power? If it does, we cannot hold it to be invalid merely because it may be an unwise law and of questionable expediency, or because it may be unable to correct the supposed evils that it is intended to remedy, or because of any other objection directed to its wisdom. This court is interested only in whether

there has been a subversion of rights as guaranteed by the constitution.

In considering the questions presented in this case, we start with the presumption in favor of the validity of the act. The burden of pointing out the provisions of the act which are in conflict with the organic law rests upon those who assail it. Failing in this, the act must stand.

■ When the constitutionality of an act of the legislature is involved, the question of legislative power is fundamental to the inquiry. In this connection, it will be remembered that the power of the legislative body is supreme except as it is limited by the constitution. When, therefore, the legislature has passed an act, it possesses that binding force and effect named therein unless it is clearly in conflict with the fundamental law. With these conceptions, let us proceed to examine the act and its relation to our constitution.

Fair trade acts have been passed in forty-five states in the union. In addition, Congress passed the Miller-Tydings amendment (Public Act No. 314, Seventy-fifth Congress) to the Sherman anti-trust act in 1937 (15 U. S. C. A., § 1). For all practical purposes, this amendment bears a great similarity to the various state fair trade acts.

In a case comment, 34 Mich. Law Rev. 691, the author succinctly states the reason for the enactment of fair trade legislation:

"It will be recalled that this practice [retail price cutting], which began its phenomenal growth shortly before the beginning of the present century, created what many believed to be two serious evils. Because it made the price of nationally advertised products vary from store to store and city to city, it forced the producer of such goods into virtual competition with himself, allowed others to capitalize on his extensive advertising campaigns, and eventually lowered

his article in the eyes of the consumer. But worse than this, it drove to the wall many small retail merchants who, because of large overheads and small turnovers, could not compete. This latter not only seriously affected the public but deprived the trademark owner of available markets and tended to fetter competition in the retail trade."

The Washington fair trade act, Laws of 1935, chapter 177, p. 657, first enacted as a two-year emergency measure and reenacted in 1937 (Laws of 1937, chapter 176, p. 684, Rem. Rev. Stat. (Sup.), §§ 5854-11 to 5854-16) as permanent, represents an attempt on the part of the legislature to eliminate certain business practices. Its avowed purpose is expressed in the title:

"An Act to protect trade-mark owners, distributors and the public against injurious and uneconomic practices in the distribution of articles of standard quality under a distinguished trade-mark, brand or name." Laws of 1937, chapter 176, p. 684.

The act is unambiguous and quite simple. In it is found a legislative declaration legalizing a contract whereby the producer or owner of a commodity, which bears his trade-marks, brands or name may make an agreement that the buyer of such commodity will not resell it except at the price stipulated by the vendor, and that such buyer require that his vendee will not resell except at the original stipulated price. The act further provides that anyone wilfully and knowingly advertising, offering for sale, or selling any of the contracted articles at less than the price named in the contract shall be guilty of unfair competition and may be enjoined by a suit in equity and may also be subject to an action at law for damages.

Appellants contend that the effect of the statute is to prohibit any person from reselling a commodity except at a price fixed by the producer, and that the

contracts in question are in direct conflict with Article XII, § 22, of our state constitution which reads:

"*Monopolies and trusts shall never be allowed in this state, and no incorporated company, copartnership,* or association of persons *in this state shall directly or indirectly* combine or *make any contract with any other incorporated company,* foreign or domestic, through their stockholders, or the trustees, or assignees of such stockholders, *or with any copartnership* or association of persons, or in any manner whatever, *for the purpose of fixing the price* or limiting the production or regulating the transportation of any product or commodity. The legislature shall pass laws for the enforcement of this section by adequate penalties and in case of incorporated companies, if necessary for that purpose, may declare a forfeiture of their franchise." (Italics ours.)

On the other hand, respondents construe this section as to include *only* those contracts fixing prices which are entered into as an attribute or a component part of a monopoly or combination. In addition, respondents contend that a distinction must be drawn between two types of price-fixing agreements: (1) a horizontal arrangement and (2) a vertical arrangement. The former is defined as an agreement among competing producers, manufacturers, etc., establishing a minimum price at which *they* shall sell their similar commodities. While the latter, as provided by the act, is a contract between a producer, manufacturer, etc., and a reseller establishing the minimum price of a commodity: (1) which bears the trade-mark, brand, or name of the producer or owner of such commodity, and (2) which is in fair and open competition with commodities of the same general class produced by others.

In reference to vertical arrangements, the court in *Lilly & Co. v. Saunders,* 216 N. C. 163, 4 S. E. (2d)

528, 125 A. L. R. 1308, makes the following observation:

"The agreements authorized by the law are vertical—between the manufacturers or producers of the particular branded commodity and those handling the product in a straight line down to and including the retailer; not horizontal, as between producers and wholesalers or persons and concerns in competition with each other in dealing with like commodities. The law does not authorize cross agreements between competitors. Whatever agreements are permitted, all face one way; they apply only to commodities produced by the manufacturer, bearing his trade-mark, brand, or name, and then only if they are in free and open competition with commodities of the same general class produced or distributed by others."

■ Horizontal price fixing is an illegal restraint of trade under the Sherman anti-trust act and an unfair practice under the Federal Trade Commission act. That the fair trade act was not meant to legalize horizontal agreements is established by § 4 (Rem. Rev. Stat. (Sup.), § 5854-14):

"This act shall not apply to any contract or agreement between producers or between wholesalers or between retailers as to sale or resale prices."

Thus we are confronted with the question of whether the prohibition in Article XII, § 22, against price-fixing contracts, includes fair trade agreements. In several cases we have had occasion to construe Article XII, § 22 of our state constitution.

In *American Export Door Corp. v. Gauger Co.*, 154 Wash. 514, 283 Pac. 462, in deciding whether an agreement between door manufacturers, forming a sales corporation to handle all the doors produced for export and to fix prices, conflicted with § 22, we stated:

"Without going into history, it is sufficient to say that our constitutional provision above quoted [Art. XII, § 22] is simply a recognition of the common law

on the subject reduced to definite terms and made the fundamental law of the state. It was adopted before the enactment of the Sherman Anti-Trust law by the Congress of the nation, and it stands as the complete and wholly unobscured guide pointing out the plain pathway of public policy in this state."

In *Fisher Flouring Mills Co. v. Swanson*, 76 Wash. 649, 137 Pac. 144, 51 L. R. A. (N. S.) 522, plaintiff company sought to enjoin defendant retailer from selling its highly advertised and identified brand of flour at less than a figure established by a resale price contract. This court stated the issue to be:

"Has a manufacturer, who has given a reputation to particular goods which he creates, the right to fix in his contract of sale to retailers a reasonable minimum price at which those goods shall be sold to consumers?"

After distinguishing between fixing the price (1) on all brands of high grade flour and (2) on one brand of identified flour, we granted the injunction upholding the resale price contract, stating:

"The foregoing authorities make it clear that the courts now generally recognize, as the basis of the rule of public policy against restraints on competition, the tendency to create a monopoly. It is manifest that a restriction of competition between the owners of an insignificant part of the entire supply of a given commodity in a given community could not create a monopoly nor injuriously affect the public."

Later in the opinion, the court observed:

"Such a contract as that here in question is of interest to the public only where the whole of a given commodity, or a measureable approximation to the whole of that commodity, is in the control of one of the contracting parties, or of some combination of which he is a member or which dictates his policy. It is monopoly, either actual or approximate, hence potential, against which the public interest is arrayed, not a fair reward to individual effort and initiative,

which is as essential to competition as a competitive price. In the absence of a monopoly, either actual or potential, as above defined, a contract fixing retail prices to the consumer cannot have an effect appreciably inimical to the public interest, because it cannot fix prices at an unreasonably high figure without defeating its own purpose by either signally failing to maintain the fixed price, or putting the individual manufacturer out of business. In either case, it fails to restrict competition."

See, also, *State v. Scollard*, 126 Wash. 335, 218 Pac. 224, 32 A. L. R. 1082, and *State ex rel. Hamilton v. Standard Oil Co.*, 190 Wash. 496, 68 P. (2d) 1031.

From the foregoing, it must be concluded that resale price contracts are not an innovation in this state. Without the fair trade act, this court has upheld their validity.

Of the forty-five states which have enacted fair trade acts, eleven courts of last resort have had occasion to pass upon their constitutionality. All but the state of Florida have upheld them. In that state, the act was declared void because of a defective title. *Bristol-Myers Co. v. Webb's Cut-Rate Drug Co.*, 137 Fla. 508, 188 So. 91. While the supreme court of South Carolina has not yet passed upon the act, the federal district court in *Miles Laboratories v. Seignious*, 30 F. Supp. 549, upheld it. The adjudicated decisions may be divided into two groups: (1) states possessing anti-monopoly statutes and (2) states possessing anti-monopoly constitutional provisions.

In group one, the following cases upheld the constitutionality of the fair trade act: *Max Factor & Co. v. Kunsman*, 5 Cal. (2d) 446, 55 P. (2d) 177, 299 U. S. 198, 81 L. Ed. 122, 57 S. Ct. 147; *Pyroil Sales Co. v. Pep Boys*, 5 Cal. (2d) 784, 55 P. (2d) 194, 299 U. S. 198, 81 L. Ed. 122, 57 S. Ct. 147; *Seagram-Distillers Corp. v. Old Dearborn Distributing Co.*, 363 Ill. 610, 2 N. E. (2d) 940, 299 U. S. 183, 81 L. Ed. 109, 57 S. Ct. 139,

106 A. L. R. 1476; *Triner Corp. v. McNeil,* 363 Ill. 559, 2 N. E. (2d) 929, 104 A. L. R. 1435; *Weco Products Co. v. Sam's Cut Rate,* 296 Mich. 190, 295 N. W. 611; *Johnson & Johnson v. Weissbard,* 121 N. J. Eq. 585, 191 Atl. 873; *Bourjois Sales Corp. v. Dorfman,* 273 N. Y. 167, 7 N. E. (2d) 30, 110 A. L. R. 1411, reversing *Doubleday, Doran & Co. v. Macy & Co.,* 269 N. Y. 272, 199 N. E. 409, 103 A. L. R. 1325; *Bristol-Myers Co. v. Lit Bros.,* 336 Pa. 81, 6 A. (2d) 843; and *Weco Products Co. v. Reed Drug Co.,* 225 Wis. 474, 274 N. W. 426.

In addition, the United States supreme court in *Old Dearborn Distributing Co. v. Seagram Distillers Corp.,* 299 U. S. 183, 81 L. Ed. 109, 57 S. Ct. 139, 106 A. L. R. 1476, upheld the Illinois act, and in *Kunsman v. Max Factor & Co.,* 299 U. S. 198, 81 L. Ed. 122, 57 S. Ct. 147, it upheld the California act.

In group two, the following courts have upheld the act: *Goldsmith v. Mead Johnson & Co.,* 176 Md. 682, 7 A. (2d) 176; *Lilly & Co. v. Saunders,* 216 N. C. 163, 4 S. E. (2d) 528, 125 A. L. R. 1308; *Miles Laboratories v. Seignious,* 30 F. Supp. 549; and *Miles Laboratories v. Owl Drug Co.,* 295 N. W. (S. D.) 292. In connection with group two, while there is a wide variety of constitutional provisions, all aim at the same objective.

In the last cited case, the supreme court of South Dakota had before it a constitutional provision and statute very similar to ours. In deciding the issues, the court stated:

"But this is not the kind of a monopoly that is aimed at by Section 20 of Art. 17 of the Constitution. *Walter A. Wood Mowing & Reaping Co. v. Greenwood Hardware Co.,* 75 S. C. 378, 55 S. E. 973, 9 L. R. A., N. S., 501, 9 Ann. Cas. 902; *Grogan v. Chaffee,* 156 Cal. 611, 105 P. 745, 746, 27 L. R. A., N. S., 395.

"A monopoly such as is meant by Section 20 of Art.

17 of our Constitution exists only where all or so nearly all of a product or commodity within a community or district is brought into the hands of one man or set of men, as to practically bring the handling or production of the commodity within such single control, to the exclusion of competition or free traffic therein. *Grogan v. Chaffee, supra.* To render the protection against monopoly more effective, this constitutional provision prohibits certain combinations and agreements dealing with the production, transportation and price of commodities insofar as they tend substantially to stifle competition. The 'Fair Trade Law' does not purport to give the producer the right to stifle competition in a commodity. The right to stabilize the price of a 'brand' in the manner described in the act may only be acquired or maintained if the commodity remains in free and open competition. SDC 54.0402. An act which grants rights conditioned upon the maintenance of free competition does not purport to authorize the making of a 'contract . . . or in any manner whatever to fix the prices, . . . of any product or commodity so as to prevent competition.' "

■ A constitutional provision must be regarded as a whole, with effect and meaning given to every part subjected to construction. *State ex rel. Wolfe v. Parmenter,* 50 Wash. 164, 96 Pac. 1047, 19 L. R. A. (N. S.) 707; *Chlopeck Fish Co. v. Seattle,* 64 Wash. 315, 117 Pac. 232.

■ The history of the times and the circumstances under which the provision was adopted may be considered in the construction. *State ex rel. Mason County Logging Co. v. Wiley,* 177 Wash. 65, 31 P. (2d) 539.

■ That the framers intended that § 22 of Article XII should deal with monopolies is clearly established by its reference to "Monopolies and Trusts." Moreover, a reading of § 22, giving to each word its ordinary meaning, indicates that the language relating to

price fixing cannot be lifted out of its natural context and considered apart from the rest of the provision. The entire section must be read, construed, and applied as a whole. Thus the language in § 22 with reference to price fixing must relate to the essential purpose of the provision, namely, the prohibition of monopolies.

The effect of a fair trade contract, fixing the price of a trade-marked commodity "which is in free and open competition with commodities of the same general class," and an agreement, establishing the price of a commodity whose market supply or output is controlled, is very great. The picture may better be observed by distinguishing between (1) fixing the price of a certain identified article in competition with other like articles, and (2) fixing the price on the whole supply of that commodity. In the fair trade contract price, the identified commodity will compete with similar identified and nonidentified commodities. While in the latter, competition, the essence of our economy, is stifled with the price being pegged as a component part of the monopoly scheme.

Since price fixing becomes injurious only when competition is unreasonably restrained and since competition is only unreasonably restrained when a monopoly and other such devices exist, it would have been illogical for the framers of our constitution to condemn price fixing *per se*. Thus we conclude that Article XII, § 22, does not prohibit such resale price contracts as are provided by the act in question.

Appellants direct their challenge against the noncontracting party section of the fair trade act. Section 3 thereof (Rem. Rev. Stat. (Sup.), § 5854-13) provides:

"Wilfully and knowingly advertising, offering for sale or reselling any commodity at less than the price stipulated in any contract entered into pursuant to

the provision of section 1[2] of this act, whether the person so advertising, offering for sale or selling *is or is not a party to such contract,* is unfair competition and is actionable at the suit of any person damaged thereby." (Italics ours.)

It is appellants' contention that this section authorizes the fixing of an arbitrary minimum price which will bind any reseller, even though not a party to the basic resale price contract, who possesses knowledge of the agreement.

The answer to appellants' argument is two fold. In the first place, a distinction must be drawn between nonidentified commodities and identified commodities; that is, a commodity possessing a special brand or trade-mark so as to designate its creator. In the latter, the commodity has a brand or trade-mark so that it will be associated with and recognized by the consuming public.

▉ Thus in dealing with articles covered by the fair trade act, we have two things to keep in mind: (1) the commodity and (2) the trade-mark or name. This business escutcheon represents good will, a property right entitled to protection against unauthorized invasions just like any other property right. Hence, when a noncontracting party, like appellants, knowingly and wilfully vends a trade-marked article below an established resale contract price, he is committing an act of unfair competition to the owner by exploiting his good will and to the retailer by infringing upon and unfairly taking advantage of his contract.

In *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.,* 299 U. S. 183, 57 S. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476, the court stated:

"We are here dealing not with a commodity alone, but with a commodity plus the brand or trade-mark which it bears as evidence of its origin and of the

quality of the commodity for which the brand or trade-mark stands. Appellants own the commodity; they do not own the mark or the good will that the mark symbolizes. And good will is property in a very real sense, injury to which, like injury to any other species of property, is a proper subject for legislation. Good will is a valuable contributing aid to business—sometimes the most valuable contributing asset of the producer or distributor of commodities. . . . The ownership of the good will, we repeat, remains unchanged, notwithstanding the commodity has been parted with. Section 2 of the act does not prevent a purchaser of the commodity bearing the mark from selling the commodity alone at any price he pleases. It interferes only when he sells with the aid of the good will of the vendor; and it interferes then only to protect that good will against injury. It proceeds upon the theory that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes what the statute denominates 'unfair competition.' "

In the second place, appellants' argument is untenable for the reason that it purchased the commodities in question with full knowledge of the resale price restriction. Inasmuch as appellants were not obligated to purchase the branded commodities, their voluntary acquisition indicated assent to the resale price. In reference to this argument, the court, in the above cited case, observed:

"Appellants here acquired the commodity in question with full knowledge of the then-existing restriction in respect of price which the producer and wholesale dealer had imposed, and, of course, with presumptive if not actual knowledge of the law which authorized the restriction. Appellants were not obliged to buy; and their voluntary acquisition of the property with such knowledge carried with it, upon every principle of fair dealing, assent to the protective restric-

tion, with consequent liability under § 2 of the law by which such acquisition was conditioned."

Among other authorities lending support to the reasoning of the above case, we note the following: *Miles Laboratories v. Owl Drug Co.*, 295 N. W. (S. D.) 292; *Lilly & Co. v. Saunders*, 216 N. C. 163, 4 S. E. (2d) 528; *Calvert Distillers Corp. v. Nussbaum Liquor Store*, 166 Misc. 342, 2 N. Y. S. (2d) 320; *LeLong v. Mohr & Co.*, 169 Misc. 560, 8 N. Y. S. (2d) 131; *Guerlain v. F. W. Woolworth Co.*, 170 Misc. 150, 9 N. Y. S. (2d) 886; *Ingersoll & Bros. v. Hahne & Co.*, 88 N. J. Eq. 222, 101 Atl. 1030; *Johnson & Johnson v. Weissbard*, 121 N. J. Eq. 585, 191 Atl. 873; *Goldsmith v. Mead Johnson & Co.*, 176 Md. 682, 7 A. (2d) 176; *Schill v. Remington Putnam Book Co.*, 17 A. (2d) (Md.) 175; *Bourjois Sales Corp. v. Dorfman*, 273 N. Y. 167, 7 N. E. (2d) 30, 110 A. L. R. 1411.

■ That this act is a valid exercise of the police power of the state is clearly established. We held in *State v. Sears*, 4 Wn. (2d) 200, 103 P. (2d) 337, 118 A. L. R. 506, that the police power extends not only to the preservation of the public health, safety, and morals, but also to the preservation and promotion of the public welfare. Moreover, we stated that the legislature is vested with a wide discretion in determining what the public interest requires, and what measures are necessary to protect those interests. In the case at bar, the legislature decided that trade-mark owners, distributors of identified commodities, and the public needed protection against injurious and uneconomic practices. For an excellent collection of cases illustrating various economic phases within the state's police power, see *Max Factor & Co. v. Kunsman*, 5 Cal. (2d) 446, 55 P. (2d) 177.

If the legislature possesses the power to regulate prices below which a dealer may not sell ordinary

commodities, it without a doubt has the power to legalize contracts establishing the minimum price at which retailers must sell trade-marked articles. There is, perhaps, greater reason to sustain the present act than the unfair practices act, *State v. Sears, supra,* because

"Courts afford redress or relief upon the ground that a party has a valuable interest in the good-will of his trade or business, and in the trade-marks adopted to maintain and extend it." *Hanover Star Milling Co. v. Metcalf,* 240 U. S. 403, 412, 60 L. Ed. 713, 36 S. Ct. 357.

Therefore, it is our opinion that the fair trade act is not unconstitutional, and that appellants, in knowingly and wilfully selling the alleged trade-marked and named commodities with full knowledge of the resale price contracts of which respondents were parties thereto, committed an act of unfair competition within the meaning of this law.

The judgment is affirmed.

MAIN, BEALS, BLAKE, DRIVER, and JEFFERS, JJ., concur.

MILLARD, J. (dissenting)—"Nothing may endure but mutability." (Shelley.)

Under the modern trend we are given new lords, therefore new laws; in fact, under some delusion as to economic security, we are surrendering our liberties. If we continue on this course we deserve, in the words of Benjamin Franklin, "Neither liberty nor safety."

True, we held in *State v. Sears,* 4 Wash. (2d) 200, 103 P. (2d) 337, in construing the unfair practices act (Laws of 1939, chapter 221, p. 923), that the police power extends to the preservation and promotion of the public welfare, and that the legislature is vested with a wide discretion in determining what the public

interest requires, and what measures are necessary to protect those interests. We were not so mindful of that rule in *Patton v. Bellingham*, 179 Wash. 566, 38 P. (2d) 364, 98 A. L. R. 1076, in which we held that an ordinance regulating barber shops unreasonably interferes with individual rights and is an unwarranted exercise of the police power, where it undertakes to dictate the hours for opening and closing shops.

The fair trade act grants to a producer or distributor the right to enter into a contract with any retailer whereby such retailer agrees that the commodity in question shall not be sold at less than a certain unit price, in which event such contract becomes binding upon each person within this state selling or offering for sale such commodity, if notice thereof is given to such other person, and thereby such contract becomes binding not only upon the parties thereto, but upon all parties having notice of such contract.

In other words, the legislature, in violation of Art. XII, § 22 of the state constitution, attempts to legalize a contract which has for its sole purpose the fixing of the sale price of a product or commodity. The statute plainly confers upon the producer, owner, or distributor the right to make a valid contract with one individual which would fix an arbitrary resale price of a product or commodity, which arbitrary price fixing may be made binding upon every person reselling such product or commodity who has received notice of the existence of the basic contract.

We are not bound by the decisions of the supreme court of other states, nor have we hesitated in the past to align this court with the minority view on a number of questions. Even where a Federal constitutional question has been presented—the United States supreme court's interpretation of the Federal constitution is binding on us—we have followed an overruled

state supreme court decision. See *Shively v. Garage Employees Local,* 6 Wn. (2d) 560, 108 P. (2d) 354; *American Federation of Labor v. Swing,* 312 U. S. 321, 61 S. Ct. 568; *Swing v. American Federation of Labor,* 298 Ill. App. 63, 18 N. E. (2d) 258, 372 Ill. 91, 22 N. E. (2d) 857.

The case at bar is not within the principles of law announced in *State ex rel. Hamilton v. Standard Oil Co.,* 190 Wash. 496, 68 P. (2d) 1031, respecting the fixing of retail prices by contract between a manufacturer and his retailers. See *Fisher Flouring Mills v. Swanson,* 76 Wash. 649, 137 Pac. 144, 51 L. R. A. (N. S.) 522, in which we held that a manufacturer may legally enter into a contract with the retailer requiring the latter to maintain a certain price on a commodity, and that the manufacturer may legally refuse to sell his product to such retailer if such contract is not kept by the retailer.

The rule in that class of cases is limited to cases wherein an actual contract is made between the manufacturer and the retailer; that is, the minds of the parties meet and a contract is actually executed between them. In the case at bar, the situation is quite different. A manufacturer may enter into an actual contract with one retailer and by operation of law, upon the giving of notice, compel every other retailer within the jurisdiction to conform to the contract so made with the original retailer; this regardless of the wishes of the other retailers and without a meeting of the minds. The fair trade act of this state thus confers upon the manufacturer the right, by operation of law, to force all retailers to conform to a contract made with one retailer. Such an arrangement, is not contractual at all, but confers upon the manufacturer the permissive right to absolutely con-

trol, within the jurisdiction, the retail price of his product, which he may fix at any figure he desires.

The fair trade act forces upon all retailers, under severe penalties, the duty to sell a product at a price fixed by the manufacturer and in such case, although the dealer may buy this commodity in the open market, he may only resell it at a fixed price; and this, of course, destroys the principle of the free market upon which our economic form of distribution is based.

It is argued that, while it is illegal under our constitution to fix by contract or otherwise the price of all of a commodity by what has been termed horizontal price fixing, it is legal to fix the price, by so-called contract or otherwise, all of a certain brand of a commodity by what has been termed vertical price fixing. A sufficient answer is that no such distinction is found in our constitution. The argument was refuted by us in *American Export Door Corp. v. Gauger Co.*, 154 Wash. 514, 283 Pac. 462, which forecloses (if a question can be foreclosed) the question presented on this appeal and obviates necessity of resort to persuasive opinions of other state supreme courts.

In *American Export Door Corp. v. Gauger Co., supra,* the facts were that about eighty-five per cent of the manufacturers of fir doors in Washington and Oregon formed a corporation to act as sales agent for the manufacturers. Those manufacturers entered into a formal agreement, permitting the export company not only to act as its sales agent, but also to determine the price at which the fir doors should be sold to the export trade. We held that such an arrangement was illegal as creating a monopoly, and was an arrangement for the fixing of the price of a commodity. It is, of course, apparent that doors are made from material other than fir. Doors are made of pine, oak, metal, various kinds of wood, plywood, and other materials, and yet we

held that an attempt by contractual arrangement to fix the price by a vertical arrangement of one special commodity was illegal. We said:

"In the ordinary case the market is free, and independent dealers can buy from any one of many sources. Here, there is but one source, which is monopolized, and, as the evidence clearly shows, the independent dealers for export were virtually put out of business. Clearly such a condition is an unreasonable restraint of trade under the common law, and, as hereinbefore indicated, it offends against our constitutional provision against monopolies."

I quote, as follows, the apt language of counsel for appellants in answer to the argument that for economic reasons a manufacturer should be granted the right to fix retail price of his product:

"It has been strenuously contended that for good and sufficient economic reasons a manufacturer should have the right to fix the retail price at which his product should be sold. On this question of course, as is the case in most questions, there is a great deal to be said on both sides but when the Constitution of our state was adopted the makers of that document decided that the public policy of this state was opposed to contracts fixing the price of merchandise. If this rule is an economic fallacy the Constitution should be amended and we will not concern ourselves further over questions of policy or expediency."

The judgment should be reversed.

STEINERT, J. (dissenting)—In language as clear and explicit as thought can express it, Art. XII, § 22, of our state constitution specifically prohibits not only monopolies, but also the making of any contract by any incorporated company, copartnership, or association of persons with any other incorporated company, foreign or domestic, or with any copartnership, or association of persons, or in any manner whatever, *for the purpose of fixing the price of any product or*

*commodity.* It is only by the judicial invention of such artificial formulae as "vertical arrangements" and "horizontal arrangements" that the plain provisions of the constitution are circumvented. Whether these lines of "arrangement" move vertically, horizontally, or diagonally, and whether they be straight or circuitous, they all run counter to the inhibition of the constitution.

If the framers of that document understood the meaning of the somewhat nebulous term "monopoly" —and I am satisfied that they did—they certainly understood the meaning and implications of the more luminous phrase "fixing the price." They not only put a positive restriction upon both, but also commanded the legislature to enact laws for the enforcement of the constitutional section by adequate penalties and forefeiture of franchises of the offending parties. The legislature has by this act metamorphosed the constitution into a document which now permits what it plainly intended to prevent.

I dissent.

ROBINSON, C. J., concurs with STEINERT, J.