# CHARLESTON.

;SLAUGHTER, RECEIVER, v. THE THACKER COAL & COKE CO.

Submitted March 8, 1904.   Decided April 1, 1904.

1. COAL COMPANY—*Contract—Agency.*

Three coal mining companies operating in the same vein or seam in close proximity to one another and just havig commenced the development of that particular kind of coal, organize, indirectly and nominally in the names of idividuals, ·a third corporation to act as their general sales agent, and each gives it by contract the exclusive right to,sell its  entire output of ·coal, at prices uniform as to all three companies, and not to be ·departed from without the consent of all the companies, and said agent company is to advertise and introduce the coal in the ·markets, establish and control all agencies and sub-agencies, and make all sales and collections and deduct for its compensation ten cents per ton out of the proceeds of sales. *Held:* That the contract is illegal and void, its tendency being to  suppress competition and restrain trade, contrary to public policy.  (p. ·652).

Error to Circuit Court, Mingo County.

Action by W. P. Slaughter, receiver, against the Thacker Coal and Coke Company.  Judgment for defendant, and plaintiff brings error.

*Affirmed.*

SIMMS & ENSLOW, for plaintiff in error.

CAMPBELL, HOLT & DUNCAN, and RUCKER, ANDERSON & HUGHES, for defendant in error.

POFFENBARGER, PRESIDENT:

On the first day of May, 1895, there were four coal companies, ·corporations, operating in what is known as The Thacker Coal Vein in Mingo County.  They were The Thacker Coal and Coke Company, The Lynn Coal and Coke Company, The Logan Con‐ solidated Coal Company and the Maritime Coal Company.  On said date another corporation was organized, called The Thacker . Coal Company.  Its capital stock paid in was $640.00, and the principal stockholders were the Presidents of The Thacker Coal and Coke Company, The Lynn Coal and Coke Company and

The Logan Consolidated Coal Company. Small amounts of stock were taken by two other persons simply for the purpose, as is supposed, of making up the required number of persons. A. Moore, President of The Thacker Coal and Coke Co., was elected president of the new company  Said new company was organized, not for the purpose of mining coal, nor of selling coal generally, but for the sole purpose of acting as sales-agent of the companies operating in said Thacker vein, but the Maritime Co., refused to take part in its organization and also to contract with it.

On said first day of May, 1895, said agent corporation entered into a contract with The Thacker Coal and Coke Co. whereby it agreed to sell for said company, for the period of five years, not less than 20,000 tons of coal each year, or, in default thereof, to pay The Thacker Coal and Coke Co. twenty cents per ton for so much coal as it should fail to sell, in case it did fail to sell the amount stipulated. From the proceeds the agent company was to deduct and retain as compensation ten cents per ton. The Thacker Coal and Coke Co. covenanted to deliver to the agent company as much coal as it could sell, not exceeding, however, 84,000 tons each year. It was further agreed that, if the mining company should fail to deliver coal according to the agreement, it should pay the agent company ten cents per ton for coal not delivered, as compensation or liquidated damages. It was further provided that either party might terminate the agreement at the end of any year by giving sixty days notice prior thereto, April 1st being the beginning of the year fixed in the contract. The prices at which the coal was to be sold were fixed in the agreement and it was further provided that they should be adhered to by the agent company unless departure therefrom should be authorized by a minute signed by all parties producing coal from said vein for whom the said agent company should act as agent. The agent company was required to account for, and pay over, the proceeds of sales on or before the 15th day of each month. The general nature of the agent company's business, as set forth in the contract, was the selling, advertising and introducing of Thacker coal, and it had authority to adjust and settle complaints made by consumers and to select and appoint all sub-agents for the sale of said coal.

Under this contract the agent company sold for the three pro-

ducing companies with which it had contracts, up to the first of May, 1896, 124,087 tons. In the mean time, there had been paid in on the capital stock of the agent company by deduction from the proceeds of coal sold for the three operating companies, $5,360.00, which, with the amount originally paid in, $640.00, made the total sum paid in $6,000.00 Practically all of this money and the commissions, amounting to about $12,400.00, had been expended in the business of the agent company, advertising the coal, establishing agencies and sub-agencies, and providing facilities for handling and disposing of the coal. During this time Moore, President of The Thacker Coal and Coke Company, was president, and had the management of the Thacker Coal Co. About the first of May, 1896, he retired from the presidency of the agent company and Walter Graham, President of The Logan Consolidated Coal Co., succeeded him. On May 22, 1896, Moore, acting as president of The Thacker Coal and Coke Co., notified the agent company by letter that his company would not deliver any more coal under the contract, assigning as ground for its refusal that the agent company had, in the month of April, 1896, sold the coal of his company at prices less than the minimum prices stipulated in the agreement, without any authority so to do, and that the agent company had further violated the agreement by not accounting for and paying the proceeds of the sales made in April, 1896, on or before the 15th day of May, 1896. The payment complained of was by checks sent from Bluefield to Thacker, under date of May 18, 1896. In reply to this letter, Graham, president of the agent company, wrote Moore and called his attention to the fact that all parties interested had, at a certain meeting, upon the recommendation of Moore himself, unanimously agreed that the president of The Thacker Coal Co., should have discretion to make concessions in price when he should deem it expedient, and that Moore himself, as president of the agent company, had directed the sales complained of to be made as they were made. He further reminded him that it had been the practice, as established by himself, to remit for the proceeds as the money was received from the sale of the coal without regard to the day of payment stipulated in the agreement. The letter further notified The Thacker Coal and Coke Co. that it would be expected to adhere to the agreement and accord to the agent company the exclusive right to sell

all coal which the mining company should produce. Moore, as president, replied that it would withdraw from the agent company. He was then notified that the agent company would demand of his company a sum equal to ten cents per ton for 84,000 tons of coal, less the amount which had been furnished since April 1, 1896, as damages for the breach of the contract.

The agent company continued until the 31st day of July, 1896 to handle the coal of the other two companies. On that date, The Thacker Coal and Coke Co., or Moore, with the aid of parties representing The Lynn Coal and Coke Company interest or having purchased that interest, at a meeting after due notice, passed a resolution dissolving the agent corporation and appointing a trustee to wind up the business. This was followed by a chancery suit in which the assets of the defunct corporation were collected by W. P. Slaughter, special receiver and paid out *pro rata* on its indebtedness, the amount realized by the corporations being fifty-four cents on the dollar. The heavy creditors were the three producing coal companies, the amounts due them having been as follows: The Thacker Coal and Coke Co., $2,702.-34, for coal sold prior to May 22d; The Lynn Coal and Coke Co., $977.38, for coal sold probably in June and July; The Logan Consolidatel Coal Company, $1,166.89, for coal probably sold in July. The other indebtedness consisted of small amounts due to various persons, making the total indebtedness $5,164.14, while the total assets amounted to $3,951.71.

In said chancery suit, upon petition of the Logan Company, an order was made directing Slaughter, special receiver, to use The Thacker Coal and Coke Company for the damages claimed on account of the breach of the contract. In pursuance thereof, this action of *assumpsit* was brought. In addition to the common counts the declaration contains a special count on the contract. A demurrer was interposed and overruled and there was a verdict and judgment for the defendant, and the plaintiff complains of that judgment.

Under Rule 10 of this Court, the defendant cross-assigns error in the overruling of the demurrer. I am of the opinion that this assigment is well taken. But for section 10 of chapter 99 of the Code, an action of *assumpsit* would not lie upon any sealed instrument. Under it, such action does lie upon a promise, undertaking or obligation in such instrument for the payment of

money. The covenant which forms the basis of this action is to deliver coal. It is true that there is a clause by which the defendant company agrees to pay ten cents per ton as liquidated damages, but that only becomes effective upon the breach of the covenant to deliver coal. In the absence of such breach there is no agreement to pay money. The condition upon which this promise to pay money arises is one of the class the determination of which is peculiarly the subject of an action of covenant. The demand sued for here is materially different from those involved in *Kern* v. *Zeigler,* 13 W. Va. 707, and *Jones* v. *Sewing Machine Co.,* 38 W. Va. 147. However, the majority are of a different opinion and on this point the judgment of the court below must stand.

For the plaintiff in error it is said there is no evidence against his right to recover, but it is insisted for the defendant in error that the judgment cannot be disturbed for two reasons. The first is, that the contract was entered into by the parties for the purpose of destroying competition and is in restraint of trade, and, therefore, void as against public policy. In this connection it is shown that while the stock of the agent corporation stood in the name of Graham, Moore and Kirk, presidents of the three producing companies, it was taken in their names for convenience and paid for by the coal companies, and further that an effort was made by these companies to get the Maritime Coal Co. to join them. Unless this contract is within the inhibition of the Act of Congress of July 2, 1890, declaring illegal every contract and combination in the form of trust or otherwise or conspiracy, in restraint of trade or commerce among the several states or with foreign nations, it is not necessarily illegal. Although on its face it carries an apparent tendency to stifle competition and is, in that sense, in restraint of trade, it is not illegal by reason of that act unless it affects commerce among the several states or with foreign nations. *United States* v. *Freight Association,* 166 U. S., 290, 325. This contract relates simply to the sale of the output of one mine, but it appears from the evidence in the case that the agent corporation was organized for the purpose of handling the output of all the companies operating in a certain vein or seam of coal, and that two other companies had contracts with it like, or similar to, the contract with the defendant company. But it does not appear that this coal

was to be sold in any particular place nor that under this con-
tract it must necessarily go beyond the state lines. An examina-
tion of the decisions of the United States Supreme Court, con-
struing the act, makes it certain that, to be illegal thereunder, it
must fall clearly within the terms of the act. *Kidd* v. *Pearson,*
128 U. S. 1; *United States* v. *Knight,* 156 U. S. 1; *United
States* v. *Freight Association,* 166 U. S. 290. As this contract
does not do so it must be held valid so far as that act is concerned.
Is it void at common law? The modern rule on that subject is
that, although a contract may be in restraint of trade, if it is
not unreasonably so, it is enforcible. "Some of such contracts
have been held void and unenforcible in the courts by reason of
their restraint being unreasonable, while others have been held
valid because they were not of that nature. A contract may be
in restraint of trade and still be valid at common law." Mr.
Justice Peckham, in *United States* v. *Freight Association.* "The
sense of the modern decisions is that, if the restraint is only
commensurate with the fair protection of the business sold, the
contract is reasonable, valid and enforcible." *Chemical Co.* v.
*Provident Co.,* 64 Fed. Rep. 946. In that case one company sold
out its competing business to another, agreeing not to engage in
the business any more during the term of the lease. There is
ample ground for applying this principle here. These companies
were developing a new coal field. Their product was unknown
in the market and it was necessary, in order to find sale for it,
to spend large amounts of money in advertising it and establish-
ing agencies. As they all produced the same kind of coal this
could be done more advantageously and economically through
one agency than by spearate action. In accomplishing this pur-
pose it was necessary that a uniform price, as to the product of
each company, should be maintained. Otherwise, the common
agent, by discriminating between them, could have sold the coal
of one company to the exclusion of that of the others, and the
enterprise would have become impracticable and defeated its own
purpose. .The agreement to maintain uniformity of price seems,
therefore, to have been rather an incident to the main purpose,
than a design to stifle competition. "The latest decisions of
courts in this country and in England show a strong tendency to
very greatly circumscribe and narrow the doctrine of avoiding
contracts in restraint of trade. The courts do not go to the

length of saying that contracts which they now would say are in restraint of trade are, nevertheless, valid contracts, and to be ·enforced. They do, however, now hold many contracts not open to the objection that they are in restraint of trade which a few years back would have been avoided on that sole ground, both here and in England." *Matthews* v. *Associated Press,* 136 N. Y. :333.

In *Skrainke* v. *Scharringhausen,* 8 Mo. App., 522, the contract under consideration, very much like this one, was held good. The owners of certain stone quarries entered into an agreement to secure "a fair, proportionate sale of the product of all quarries at uniform prices and living rates." the terms of the agreement restricting the production of stone within certain territory, putting the sales in the hands of an agent for the interest of all parties, appointing a committee of five persons to modify prices and settle complaints, and imposing a penalty for every sale made in violation of the agreement. It is not intended here to affirm the correctness of the decision, but it illustrates the view taken by certain courts and shows that much latitude is allowed to manufacturers and producers of commodities in arrangments for facilitating production and sale. In *Diamond Match Co.* v. *Roeber,* 106 N. Y. 473, Andrews, Judge, said: "In the present state of the authorities, we think it cannot be said that the early doctrine that contracts in general restraint of trade are void, without regard to circumstances, has been abrogated. But it is manifest that it has been much weakened, and that the foundation upon which it was originally placed has, to a considerable extent at least, by the change of circumstances, been removed." Another interesting case is that of *Central Shade Roller Co.* v. *Cushman,* 143 Mass. 353. In that case the contract was one made by three manufacturers of a certain kind of curtain fixtures, under·different letters patent, owned by them severally, for the purpose of avoiding competition. It was held valid. In *Cohen* v. *Berlin-Jones Envelope Co.,* 59 N. Y. S. 588, manufacturers of envelopes, made a contract with another envelope manufacturer by which they agreed to purchase from him, at prices to be fixed from time to time by the former, a stated quantity of goods manufactured by him during a stated period, and he agreed that, during such time, he would not sell to others at a less price. Nineteen other concerns throughout the country, engaged in

manufacturing envelopes, were not parties to the agreement and their goods were in competition with those of the contracting parties. The contract was held valid, and the court recognized, as facts to be considered, that the agreement included but a small number of the manufacturers of envelopes, and that, at the time it was made, the business of manufacturing envelopes was demoralized through excessive competition. This case well illustrates the nature of the facts and circumstances to be considered in the present state of the law, in determining whether a contract, such as we have here, is void, as being in restraint of trade.

In *Horner* v. *Graves,* 7 Bing. 735, Tindall, C. J., said: "We do not see how a better test can be applied to the question, whether reasonable or not, than by considering whether the restraint is such only as to afford a fair protection to the interest of the party in favor of whom it is given, and not so large as to interfere with the interest of the public. Whatever restraint is larger than the necessary protection of the party, can be of no benefit to either. It can only be oppressive, and if oppressive, it is, in the eye of the law, unreasonable. Whatever is injurious to the interests of the public, is void, on the ground of public policy."

Applying here this test and the general principles recognized in *Cohen* v. *Berlin-Jones Envelope Co.,* it is impossible to see how the public was, or could have been, injured by this contract. Three small companies, out of the vast number of coal producing companies in this State, entered into it. The quantity of coal put upon the market by them is an utterly insignificant portion of the vast quantities thrown upon the market by the numerous competing producers. In the absence of some great combination, virtually controlling the production and price of a commodity in the country, the price is regulated and determined by the law of supply and demand. It is manifest that, by this agreement, the production of these three mines was facilitated and increased rather than stifled or curtailed. If their operation can be said to have affected the price of coal to the consumer, it is perfectly clear that the tendency was to reduce instead of increase it, because that advantageous arrangement for the sale of their output enabled them to put upon the market increased quantities of coal. The validity of this contract must be determined by its

practical effect rather than by ascertaining whether it falls within the terms of a legal definition. Contracts in restraint of trade and contracts eliminating competition, as a general proposition, are illegal and void on the ground of public policy. But it is, nevertheless, true that there are numerous contracts which all the courts hold good and which, at the same time, tend, in some degree, to restrain trade and stifle competition. As the sole and true test is, whether the contract is injurious to the public, and it is imposible to see how, in any practical sense this contract could have injured the public, there is no reason why it should be held invalid. Under different circumstances, given more extended application, one or more of the principles embodied in the contract would become injurious to the public and, therefore, vicious. So, strychnine, arsenic, and other drugs are deadly poisons, but great blessings to humanity in the hands of physicians who, by means of them, aleviate suffering and save life. Competition is said to be the life of trade, but undue or excessive competition has been judicially declared hurtful and injurious to the public. We must look at the facts as well as the definition of restraint of trade to reach a correct and just conclusion.

Upon this view of the contract, my inclination is to hold it legal, but my associates are of a different opinion. Applying the principles hereinafter stated, they consider it void, as against public policy.

"By the weight of recent authority the character of the article or legitimate trade sought to be monopolized is immaterial, the true test of the illegality of the combination being the injury to the public, and whether its necessary consequence is to control prices, limit production, or suppress competition in such a way as to restrain trade and create a monopoly. To render the combination illegal on this ground, it is not necessary that evil intent or actual injury be shown, but it is sufficient to know that the inevitable tendency of the act is injurious to the public. The fact that the immediate result of the combination has been temporarily to reduce prices, or that it may reduce them, is immaterial in determining the legality of the combination, the court not being governed by the temporary effect upon the prices, but by the power of the combination to control them." 20 Am. & Eng. Ency. Law (2d Ed.) 849, 850.

"In some way several corporations competing in production merge into one, and cease competitive production. By means of large capital this new corporation can produce largely, or limit production, lessen supply, enhance prices, and lower the prices of materials used in production. It may be said that no matter what the form adopted may be, if the end is to curtail production, enhance prices, restrain trade and competition, control the market in commodities, it is condemned by common law and by many statutes in the different states." Brannon, Fourteenth Amend. 373.

Discussing the rule stated by Tindal, C. J., in *Horner* v. *Graves,* 7 Bing. 735, and hereinbefore quoted, Judge Taft said, in *United States* v. *Addyston Pipe & Steel Co.,* 85 Fed. Rep. 271: "This very statement of the rule implies that the contract must be one in which there is a main purpose, to which the covenant in restraint of trade is merely ancillary. The covenant is inserted only to protect one of the parties from the injury which, in the execution of the contract or enjoyment of its fruits, he may suffer from the unrestrained competition of the other. The main purpose of the contract suggests the measure of protection needed, and furnishes a sufficiently uniform standard by which the validity of such restraints may be judicially determined. In such a case, if the restraint exceeds the necessity presented by the main purpose of the contract, it is void for two reasons: First, because it oppreses the covenantor, without any corresponding benefit to the covenantee; and, second, because it tends to a monopoly. But where the sole object of both parties in making the contract as expressed therein is merely to restrain competition, and enhance or maintain prices, it would seem that there was nothing to justify or excuse the restraint, that it would necessarily have a tendency to monopoly, and therefore would be void. In such a case there is no measure of what is necessary to the protection of either party except the vague and varying opinion of judges as to how much, on principles of political economy, men ought to be allowed to restrain competition. There is in such contracts no main lawful purpose to subserve which partial restraint is permitted, and by which its reasonableness is measured, but the sole object is to restrain trade in order to avoid the competition which it has always been the policy of the common law to foster."

The contract being, in the opinion of the majority of th Court illegal, and so held, no recovery can be had on it. Thi action being for the liquidated damages covenanted to be paid, i based directly and solely upon the contract. Hence, whateve errors the court may have committed, during the progress of th trial, its final judgment of *nil capiat* is right and must b affirmed, and it is useless to discuss further assignments of erroi

*Affirmed.*