[No. 21708.   *En Banc.*   December 10, 1929.]

AMERICAN EXPORT DOOR CORPORATION, *Respondent*, v.
JOHN A. GAUGER COMPANY, *Appellant.*[1]

[1]Reported in 283 Pac. 462.

*W. H. Abel, Wm. D. Askren, Geo. W. Korte,* and *E. L. Skeel,* for appellant.

*Wright & Catlett* and *Ellis & Evans,* for respondent.

TOLMAN, J.—One of the principal industries in the states of Washington and Oregon for years past has been that of the manufacture of doors and other joinery products from Pacific coast fir, a substantial part of such products having been exported to foreign markets, there meeting in competition like products chiefly manufactured in Sweden. Competition has been keen, and at times, at least, prices have not been satisfactory; and so, to better these conditions, nine corporations engaged in the business we have just described joined in organizing the respondent American Export Door Corporation and brought it into existence in December, 1926; they subscribing for all of its capital stock and each of them entering into a separate contract with it in substantially identical form, which contracts provided, among other things:

(a) That each of the nine subscribing corporations should have the right to have one of their executive officers on the board of trustees of the American Export Door Corporation;

(b) That the American Export Door Corporation should be the exclusive sales agent for all of the doors and other joinery products that each of the subscribing corporations might produce for export, and that it should receive a commission of five per cent on all sales made by it as such agent;

(c)   That prices should be fixed only by the board of trustees of the Export Door Corporation;

(d)   That all orders should be allocated by the board of trustees to the various subscribing corporations in certain definite proportions which were agreed upon and made a part of the contract;

(e)   The contract was not to apply to orders received and accepted before the organization of the Export Door Corporation, and—

(f)   That if any of the subscribing corporations violated any of the provisions of the contract, its stock holding in the Export Door Corporation might be canceled and forfeited as liquidated damages, and that such offending member should pay further liquidated damages in the sum of fifteen per cent of the value of any doors or other joinery products sold for export by it to any one other than the Export Door Corporation.

Appellant John A. Gauger Co., a corporation, doing business as Knox & Toombs, entered into this contract under date of January 18, 1927, and the other eight corporations interested entered into like contracts at about the same time. These nine corporations produced from eighty-five per cent to ninety-five per cent of all the fir doors exported from the states of Washington and Oregon. Subsequently, another producer signed such a contract, and certain other producers, while they refused to sign like contracts, did agree that they would not sell any doors for export except through the Export Door Corporation. Every producer of fir doors in the state of Washington, with one exception, signed such a contract, and the one refusing to sign entered into an agreement to sell its products only through the American Export Door Corporation.

E. W. Daniels, appellant's manager, became a member of the board of trustees of the American Export

Door Corporation, and a schedule of prices was agreed upon by the board of trustees. A general manager was employed, and in February, 1927, he was sent to the United Kingdom to negotiate with distributors and to secure orders for the products in which the Export Door Corporation was to deal. This manager, after arriving in the United Kingdom and ascertaining conditions, reported that the Swedish competition was such that it would be necessary to reduce prices on certain grades of doors. Whether he actually quoted reduced prices, or quoted them subject to ratification, is disputed. In any event, he sent a cablegram from London to the Export Door Corporation in which he unequivocally stated that he had changed certain differentials, which it is conceded meant a reduction in price.

When the cable was received, the Export Door Corporation advised appellant Knox & Toombs, quoting the cablegram referred to, and indicating that the subject would be one for consideration by the board of trustees. Immediately upon receipt of this letter quoting the cablegram, Knox & Toombs notified the American Export Door Corporation that because of reduction in price without authority from the board of trustees, and because of the disturbance of its market for its products under contracts entered into before it subscribed to the' contract with the Export Door Corporation specifically exempted by that contract, it withdrew from the contract, terminated the agency and refused further to be bound in any way. This notice was given on March 25, 1927.

Some months later, on July 12, 1927, the American Export Door Corporation began this action against Knox & Toombs, seeking an injunction restraining it from selling its product for export except through the American Export Door Corporation, and to recover

518

fifteen per cent liquidated damages on all sales of doors for export made by the appellant, since the date of the contract, to others. The trial court found that appellant was not entitled to terminate the agency, but took the position that the provision for fifteen per cent on all export sales as liquidated damages was unreasonable and could not be enforced. Damages were fixed at five per cent of the export sales as found by the court to have been made by the appellant, and an injunction was granted. From this final judgment, John A. Gauger Co., a corporation, doing business as Knox & Toombs, has appealed.

The appellants have raised many important points and supported their conclusions with substantial authority, but after considering the whole case, the view we have arrived at makes it necessary to state only one of the several points involved and that is the question of whether or no the contract is void as against public policy.

The contract between the parties is one of a series having, it is contended, as their purpose the creation of a monopoly, the limitation of production, and probably the fixing of prices in violation of Article XII, § 22, of the constitution of the state of Washington, which reads:

"Monopolies and trusts shall never be allowed in this state, and no incorporated company, copartnership, or association of persons in this state shall directly or indirectly combine or make any contract with any other incorporated company, foreign or domestic, through their stockholders, or the trustees, or assignees of such stockholders, or with any copartnership or association of persons, or in any manner whatever, for the purpose of fixing the price or limiting the production or regulating the transportation of any product or commodity. The legislature shall pass laws for the enforcement of this section by adequate penalties, and in case of incorporated companies, if neces-

sary for that purpose, may declare a forfeiture of their franchise.''

Without going into history, it is sufficient to say that our constitutional provision above quoted is simply a recognition of the common law on the subject reduced to definite terms and made the fundamental law of the state. It was adopted before the enactment of the Sherman Anti-Trust law by the Congress of the nation, and it stands as the complete and wholly unobscured guide pointing out the plain pathway of public policy in this state.

Therefore our inquiry must be as to whether the contract in question offends against its terms.

That we have here a direct combination, must be admitted. Is its purpose the fixing of prices, the limiting of the production or the regulation of the transportation of any product or commodity?

By its terms, the contract provides for the fixing of prices only on merchandise exported, and, while an argument might be advanced to the effect that controlling production and fixing export prices might and probably would result in the fixing of prices to domestic purchasers, we pass that point. Does the contract limit production?

Respondent seems to contend that the effect of the contract was not to limit production and that there was no such intention. Evidence was given upon the question of intent, and no doubt it was the hope of the promoters that the Export Door Corporation would find a market for all that the members' mills might produce, but that is not the sense in which the limiting provisions of the constitution are used. No doubt, always a monopoly hopes and intends to market all of the product which it controls, but if in doing so, in such a case as this, it destroys or infringes upon the rights of any and all others to deal freely in the same

product, then its action is an unreasonable restraint of trade under the common law and is in restraint of production under our constitution, because free and unrestrained production in the final analysis depends upon free and unrestricted trade in the article produced. In other words, the constitution contemplates a free market to both producer and purchaser.

Having invited its members to abolish their selling organizations and having set up its own to take their place, respondent would have the power to reduce the production of its members for export to nothing, if it saw fit, and that power is one of the evils which our constitution is intended to prevent.

The findings of fact and the judgment which respondent sought and obtained below also furnish a complete answer to this question. After it repudiated the contract, appellant sold doors f. o. b. its factory to brokers and dealers engaged in the export trade which it had reason to know would be exported by the purchasers. The trial court found:

"That since the execution of the aforesaid contract between plaintiff and defendant the defendant has refused and failed to assign and turn over to the plaintiff any orders or offers to purchase doors or other joinery products to be exported from the United States, although it has received such orders and offers and accepted the same and has heretofore filled and is now filling such orders; that since January 18th, 1927, up to December 1st, 1927, defendant in violation of the contract had received, accepted and filled orders for 97,565 doors to be exported from the United States of America, the F A S steamer value of which doors so sold for export being $159,997.71; there being attached to this finding lists showing said orders under the defendant's order numbers, the date when received and shipped, the number of doors and the value of the same on each order so filled, together with the exhibit numbers as shown in the evidence.

"That the defendant threatened and threatens to continue to make sales of doors for export from the United States of America, not through the plaintiff, and contrary to the aforesaid contract, and has announced that it will not carry out its obligations under the above contract in any way, and has entered into contracts with other agents represented in the export of such doors from the United States of America, and it will be necessary for the plaintiff in order to enforce its rights against the defendant, if not granted equitable relief in this action, to institute many actions;"

and entered judgment accordingly. Plainly, then, as to all which might be sold to independent brokers and dealers for export, the production was limited, if not totally prohibited. This is limiting production in the constitutional sense. But, says the respondent, such brokers and export dealers might have purchased from the American Export Door Corporation itself. True, that is not forbidden by the contract and is a possibility, but is it reasonable to suppose that a concern, situated as respondent is, seeking to monopolize the export trade, will sell to its rivals on a basis which will permit them to compete with it? The evidence shows that it would not. The question answers itself.

The evidence discloses that there are but few independent dealers and brokers engaged in this export trade, perhaps but ten in all. Of these, respondent asserts three only are Washington corporations, but that is immaterial. All do or did business in this state by here purchasing a large part of the products in which they deal, and even a foreign corporation doing business in this state is entitled to claim the protection of its laws; or, passing that, one citizen of this state may claim the protection of our constitution just as surely and just as certainly, though he alone is affected by

the act complained of, as though a majority of our citizens were likewise affected.

The evidence clearly establishes that the effect of the contract in question was to greatly limit, embarrass and in some instances practically end the business of the independent dealers and brokers in doors for export, a result which we hold comes within the constitutional prohibition.

In *Manson v. Hunt,* 82 Wash. 291, 144 Pac. 45, we recognized and gave effect to this constitutional provision under facts no more certainly pointing to monopoly; and in *Washington Cranberry Growers Ass'n v. Moore,* 117 Wash. 430, 201 Pac. 773, 204 Pac. 811, 25 A. L. R. 1077, we said:

"The appellant contends that a monopoly is created, trade restrained, the output of cranberries limited and prices are controlled. It may be admitted that, if this is the effect of the contract and the business transacted under it, it would be void and unenforcible."

But in that case the cooperative association in question controlled only about two per cent of the product, while here it is undenied that respondent's control, if its contracts be enforced, is practically total.

*Inter City Auto Stage Co. v. Bothell Bus Co.,* 139 Wash. 674, 247 Pac. 1040, might well have been put upon the sole ground that the monopoly there in question was a regulated monopoly under the statute creating it, the service and the rates both being subject to regulation by a department of the state government, hence, so far as it affected the public or the individual members thereof, it was no monopoly at all in the constitutional sense.

Under constitutional provisions and statutes against monopolies similar to ours, other states have, with considerable unanimity, denounced such contracts.

Cases sufficiently parallel upon the facts to be authority here are:

*Pocahontas Coke Co. v. Powhatan Coal & Coke Co.*, 60 W. Va. 508, 56 S. E. 264, 116 Am. St. 901, 10 A. L. R. (N. S.) 268; *Santa Clara Valley M. & L. Co. v. Hayes*, 76 Cal. 387, 18 Pac. 391; *Slaughter v. Thacker Coal & Coke Co.*, 55 W. Va. 642, 47 S. E. 247, 104 Am. St. 1013, 65 L. R. A. 342; *Arnot v. Pittston & Elmira Coal Co.*, 68 N. Y. 558, 23 Am. Rep. 190; *Texas Standard Oil Co. v. Adoue*, 83 Tex. 650, 19 S. W. 274, 29 Am. St. 690, 15 L. R. A. 598; *People v. North River Sugar Refining Co.*, 54 Hun 354, 7 N. Y. Supp. 406; *State v. Smiley*, 65 Kan. 240, 69 Pac. 199, 67 L. R. A. 903; *Vulcan Powder Co. v. Hercules Powder Co.*, 96 Cal. 510, 31 Pac. 581; *Chicago, Wilmington & Vermillion Coal Co. v. People*, 114 Ill. App. 75; *Morris Run Coal Co. v. Barclay Coal Co.*, 68 Pa. St. 173, 8 Am. Rep. 159; and *Finck v. Schneider Granite Co.*, 187 Mo. 244, 86 S. W. 213, 106 Am. St. 452.

That which amounts to a complete monopoly of the source of supply, presents a far different condition than that presented by the ordinary cooperative association covering a product as produced only in a limited field, which product must be marketed in competition with like products from all other districts and sources.

In the ordinary case the market is free; and independent dealers can buy from any one of many sources. Here, there is but one source, which is monopolized, and, as the evidence clearly shows, the independent dealers for export were virtually put out of business. Clearly such a condition is an unreasonable restraint of trade under the common law, and, as hereinbefore indicated, it offends against our constitutional provision against monopolies.

But, says the respondent, we are organized to act under the Webb-Pomerene Act (40 Stat. L. 516, ch. 50), and by that act those engaged in export are released from the monopolistic prohibitions of other laws.

Of course, the Congress cannot by its legislation nullify the constitution of any state relating to a domestic matter and equally, of course, the manufacture of doors is not interstate commerce. *Anderson v. Shipowners' Ass'n of Pacific Coast,* 272 U. S. 359; *United Leather Workers International Union v. Herkert & Meisel Trunk Co.,* 265 U. S. 457.

But let us see what the Webb-Pomerene Act provides. Section 2 of that act, which covers the present question, reads:

"That nothing contained in the Act entitled 'An Act to protect trade and commerce against unlawful restraints and monopolies,' approved July second, eighteen hundred and ninety, shall be construed as declaring to be illegal an association entered into for the sole purpose of engaging in export trade and actually engaged solely in such export trade, or an agreement made or act done in the course of export trade by such association, provided such association, agreement, or act is not in restraint of trade within the United States, and is not in restraint of the export trade of any domestic competitor of such association: And provided further, that such association does not, either in the United States or elsewhere, enter into any agreement, understanding, or conspiracy, or do any act which artificially or intentionally enhances or depresses prices within the United States of commodities of the class exported by such association, or which substantially lessens competition within the United States or otherwise restrains trade therein."

The words,

". . . provided such association, agreement, or act is not in restraint of trade within the United

States, and is not in restraint of the export trade of any domestic competitor of such association,''

seem exactly to except the present situation. If it were necessary to pass upon the Webb-Pomerene Act, which we think it is not, we should be obliged to hold that the present contract, by limiting the purchase and procuring of doors by independent dealers for export, comes within the exception and is still unlawful.

As already said, the findings and judgment appealed from conclusively establish that the contract is in unreasonable restraint of trade within the United States and in restraint of the export trade of competitors, else there could have been no recovery of damages and no enjoining of sales to competing exporters.

Respondent contends that, if this be the meaning of the exception in the Webb-Pomerene Act, then that act is a useless thing, because prices cannot be regulated abroad without a control of the source of supply, but, in the light of our constitution, that is not a question which should influence us, nor is it one which we should now decide.

Being convinced that the contract violates our constitutional provision against monopolies and is void under the common law, because it seeks an unreasonable restraint of trade, the judgment is reversed with directions to dismiss the action.

MITCHELL, C. J., PARKER, MAIN, BEALS, FRENCH, and MILLARD, JJ., concur.

HOLCOMB, J. (dissenting)—Having personally made an exhaustive study of the record in this case and of the law applying, I am unable to concur in much that is said in the prevailing opinion both as to the facts and the law.

To begin with, I am unable to yield my assent to the statement that the finding of fact quoted in the opinion has the effect of limiting production in this state in

the constitutional sense. Again there is a mistake in the statement as to what was held in the *Washington Cranberry Growers Ass'n v. Moore*, 117 Wash. 430, 201 Pac. 773, where it is said that the cooperative association in question controlled only about two per cent of the product, while here it is undenied that respondent's control, if its contracts be enforced, is practically total. What was said in the *Cranberry Growers Ass'n* case, *supra*, was that it controlled about two per cent of the berries produced *in the United States*. As a matter of fact it was admitted to control practically the entire production in the state of Washington as to the marketing thereof. That is not the case here. This association does not control practically all the output of the door manufacturers as to the marketing thereof. The contract specifically excepts the sale of doors in the domestic trade and it was organized under the Webb-Pomerene Act for the purpose only of effecting the betterment of sales and prices in foreign markets. It is not as much of a monopoly within this state as was the Cranberry Growers Association.

However, the argument of the majority is unsound under their own interpretation of the law. It is monopolies that are forbidden by our constitution and if they are unlawful at all they are unlawful regardless of the degree to which they may be effective in restraining trade.

The case of *Manson v. Hunt*, 82 Wash. 291, 144 Pac. 45, differed widely from this case. In that case there was a contract deliberately entered into by the parties which was known to be illegal and unconstitutional, designated by them as a "gentlemen's agreement," for the purpose of limiting transportation in public waters by public carriers between Tacoma and Quartermaster Harbor. It was a contract affecting local or

domestic transportation exclusively, and was void under Article 12, § 22, of the constitution as being a contract for the purpose of fixing the price or limiting the transportation of any commodity.

. All our cooperative marketing cases sustain this organization. They are too numerous to mention.

Although there is nothing set forth in the opinion to so show, a reading of the entire contract involved herein positively discloses that the contract contained nothing preventing sales to competing exporters. The record shows that there have been sales to competing exporters.

However, the chief question is whether the contract with this corporation, organized for the purpose of deriving the benefits of the Webb-Pomerene Act exclusively, is contrary to the provisions of our state constitution above cited. In considering such questions the dominant consideration always is the welfare of the public (*Fisher Flouring Mills Co. v. Swanson*, 76 Wash. 649, 137 Pac. 144, 51 L. R. A. [N. S.] 522), and whether, under the circumstances of the particular case, they are reasonable in reference to the interest of the public. *United States v. Addyston Pipe & Steel Co.*, 85 Fed. 271. Not every monopoly or combination in restraint of trade is illegal or void, but only such as is undue or unreasonable or injurious to the public interest. *Washington Cranberry Growers Ass'n v. Moore; Fisher Flouring Mills Co. v. Swanson; United States v. Addyston Pipe & Steel Co., supra; Standard Oil Co. of New Jersey v. United States*, 221 U. S. 1; *United States v. American Tobacco Co.*, 221 U. S. 106; *United States v. International Harvester Co.*, 274 U. S. 693.

It may be pointed out that the public is not here complaining. No one is complaining but one of the parties to the contract, and it is permitted to escape

from its solemn contract in violation of that principle of law that public policy is as much concerned in holding persons to their contracts as in prohibiting contracts in restraint of trade. *Lumbermen's Trust Co. v. Title Insurance & Investment Co. of Tacoma,* 248 Fed. 212; *Inter City Auto Stage Co. v. Bothell Bus Co.,* 139 Wash. 674, 247 Pac. 1040.

Our constitutional ban on monopolies can only apply to monopolies existing entirely within the state. It cannot apply to corporations organized for the purpose of engaging solely in export trade as this one was, under the Webb-Pomerene act. The construction by the majority of the proviso in § 2 of the Webb-Pomerene Act implies that that section contains its own death clause. If that be true, the Webb-Pomerene Act is utterly inoperative. However, no other state or Federal court is likely to give it that construction. Other states will enjoy the benefits of the Webb-Pomerene Act by sustaining their exporting corporations, while ours will be cut off from its benefits, and utterly impotent. It is a Federal field of legislation, and the law was meant to supplant Federal and state restrictions for the promotion of foreign trade and commerce. The decision in this case is quite dissimilar to the statesmanlike utterance of President Wilson in his message to Congress on December 5, 1916, in which he referred to the Webb-Pomerene bill then pending, as a measure of capital importance and as one

". . . which seeks to extend greater freedom of combination to those engaged in promoting the foreign commerce of the country that is now thought by some to be illegal under the terms of the law against monopoly."

For the foregoing reasons, and others more specific which, had I the time, I would express, I dissent.

FULLERTON, J., concurs with HOLCOMB, J.